**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael R. MOORE, Defendant and Appellant.**

**No. 890558–CA.**

Court of Appeals of Utah.

Nov. 8, 1990.

James N. Barber, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, State Atty. Gen., Barbara Bearnson, Asst. Atty. Gen., for plaintiff and appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

GREENWOOD, Judge:

Appellant Michael R. Moore appeals his conviction of eight counts of securities fraud, in violation of Utah Code Ann. § 61–1–1(2) (1989). We affirm.

## BACKGROUND

This case arises from Moore's sale of promissory notes to eight Utah investors between October 11, 1982 and April 15, 1983. The notes were issued by American Factoring Corporation (AFC), of which Moore was founder, president, and director. AFC was incorporated in 1981. A

total of over $290,000.00 was paid to AFC by the eight investors.[1]

A prospectus issued by AFC in September 1982 described AFC's business to be primarily "factoring." As defined in the prospectus, factoring consists of the purchase of short-term notes and accounts receivable of other businesses at a discount, then collecting on those notes and receivables when due. The difference between the discounted purchase price and collection of the notes and receivables at face value is profit to the factoring company. The discount at which AFC was to purchase the notes and receivables was calculated so that, upon collection, AFC would realize a gross return of five to fifteen percent per month, or a minimum of sixty percent per year, on its factoring outlays.

The prospectus stated that AFC would pursue several measures to protect the funds it used to purchase notes and receivables from its factoring clients. First, AFC would require a personal guarantee from principals of its clients that any notes or receivables that proved to be uncollectable would be repurchased from AFC. Second, AFC would require delivery of additional security from its clients to protect AFC's interest in the event of uncollectable accounts. Finally, AFC would "attempt[ ] to make the necessary verification of the existence and collectability of all such accounts purchased...."

AFC raised the cash for purchasing notes and receivables through the sale of its own promissory notes. The high rate of return on its factoring business was supposed to enable AFC to pay high interest to those investing in AFC's promissory notes. For six-month, one-year, and two-year notes, respectively, the prospectus indicated that AFC would pay twenty-four, thirty, and thirty-six percent per year in interest. Notes in a principal amount of $20,000 or more would pay an additional three percent. Investors could choose to receive monthly interest payments or to

1. From 1981 to 1985, AFC raised a total of approximately five million dollars from the sale of promissory notes to all of its investors. As of March 1985, $4.7 million had not been repaid, and interest was accumulating at $2.4 million per year.

allow the interest to compound over the term of the notes.

AFC's business did not consist solely of factoring, however. The prospectus indicated that AFC investor funds would also be used "to conduct asset-secured financial services other than its primary business of factoring." Such services would include making loans secured by accounts receivable, inventory, equipment, and real estate. These additional services, according to the prospectus, would allow AFC flexibility "to take better advantage of changing economic trends."

The AFC prospectus also warned potential investors that the promissory notes were speculative, unsecured,[2] nonguaranteed obligations of AFC. The financial risk entailed by AFC's operations would be borne largely by the purchasers of its promissory notes. Investors were warned that AFC's success depended on future, uncertain general economic conditions. Finally, the prospectus stated that it spoke "only as of its date," and that no representations about AFC other than those contained in the prospectus were authorized.

The promissory note sales in question were made in Duchesne and Uintah counties by AFC sales representative Glen Bingham. Bingham provided a copy of the AFC prospectus to each of the eight investors. However, instead of limiting his sales pitch strictly to the contents of the prospectus, he also told investors that the security required by AFC from its factoring clients consisted of collateral worth two to four times the face value of the factored notes and receivables. Bingham obtained this information by reviewing AFC documents made available to him by Moore. These documents consisted largely of deeds and appraisals on real property.

Based on the representations of the prospectus and Bingham, each of the eight investors purchased two-year notes from AFC. Subsequently, this "pretty, great" investment scheme failed. About May 1983, AFC suspended its promissory note

offering because its major debtor clients appeared to be in default, posing a serious risk that AFC would be unable to make good on the obligations to its investors. At the time of Moore's trial, over five years later, none of the eight investors involved here had received any repayment of the principal amount of their notes. Four of the largest investors, accounting for $215,-000 of the total invested, had received a total of $62,505 in monthly interest payments; however, no interest had been paid after December 1983, and none of the other investors received any interest.

After an investigation of AFC by the Utah Attorney General's Office, an original information charging Moore with securities fraud in connection with the promissory note sales was filed on October 5, 1987. The information was amended at the start of trial, September 19, 1988, deleting a charge involving a ninth AFC investor who had died, and narrowing the remaining eight charges to allege violations only of Utah Code Ann. § 61–1–1(2), which provides:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>
> . . . . .
>
> (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

Moore's jury trial lasted five days. The section 61–1–1(2) violation alleged by the State consisted of untrue statements and omissions made by Moore through the AFC prospectus and sales representative Bingham. The State charged that, contrary to these representations, AFC had not been primarily engaged in factoring, that AFC's factoring and loan outlays were not adequately secured, and that AFC's efforts to check on the existence and collectability of the accounts factored for its clients were inadequate.

---

**2.** The prospectus contradicted itself as to whether AFC's notes were secured or unsecured. On the page following the warning that the notes were not secured, the prospectus stated that AFC's notes were "evidence of secured debt obligations of the Company only...."

The State's witnesses included all eight of the involved investors, former AFC employees, three AFC clients, and a certified public accountant called as an expert. Extensive exhibits related to AFC transactions were introduced in connection with most testimony.

Each investor recalled the description of factoring as a prominent feature of the prospectus and Bingham's sales pitch. Four investors testified that they would have been concerned had they learned that AFC was not actually engaged in factoring.[3] All but one investor specifically remembered the assurance that AFC's factoring outlays would be protected by collateral at two to four times the value of the factored accounts and notes.

On cross-examination, Moore's counsel attempted, with varying success, to elicit admissions from the investors that the exact nature of AFC's activities was of less concern to them than the high interest offered on the AFC notes. He also confronted them with the prospectus language describing AFC's "other activities" besides factoring, as well as the warnings of the speculative nature of the investment.

Several witnesses provided evidence that AFC was not primarily engaged in factoring. Former AFC employees were unable to identify any AFC personnel actually engaged in seeking notes and accounts to purchase, nor anyone charged with collecting on such notes and accounts.

AFC's two largest clients testified that they had received loans from AFC that were structured to look like factoring.[4] One of these clients, Harold Jay Dent, had an agreement with Moore whereby the loans would not be repaid, but instead converted into AFC's equity in a joint land speculation scheme. Dent testified that he had, with Moore's knowledge, pledged third-party promissory notes that were unsupported by any real debt as collateral for these loans. The other client, Lynn Bogart, also borrowed money for real estate speculation. Bogart testified that he had, at Moore's request, created phony accounts receivable to give the appearance of factoring. Moore had even assisted in creating these phony receivables. A third major client, Mark Wood, had asked AFC to collect on apparently genuine receivables he had pledged as security for an AFC loan and was refused.

The State's expert witness testified that, in his opinion, AFC had not used the funds obtained from its investors as the prospectus said it would. He stated that AFC had not been engaged in factoring while the prospectus was in effect. He also noted that together, Dent and Bogart accounted for sixty-nine to eighty-one percent of AFC's total cash outlays;[5] the reliance on so few clients for most of its business was a significant difference from usual factoring practice.

Several witnesses testified that the Dent and Bogart loans were never repaid, but simply rolled over, along with accrued interest, into new loans. AFC thus received practically no net income from these loans. A former AFC bookkeeper testified that the bulk of cash coming into AFC at all times was investor funds, not factoring proceeds.

Moore's counsel intensively cross-examined the State's witnesses regarding whether AFC actually engaged in factoring. He invited the inference that unknown AFC personnel could have been engaged in buying and collecting on notes and accounts to factor. Bogart was impeached on the basis

---

3. The first four investors so testified. Moore objected to the hypothetical nature of the State's question when asked of the fourth investor. Although the objection was overruled, the State did not ask the question of the remaining four.

4. For clarity, the clients are referred to by the names of the principals of the businesses that actually incurred the debts to AFC. Harold Jay Dent was a principal in Dent and Associates; Lynn Bogart was the president of Lanseair Corporation; Mark Wood headed Teleproductions, a division of M.A. Wood, Inc.

5. His written report indicated sixty-nine percent; his trial testimony was eighty-one percent. Cash loans to Mark Wood, plus payments to Moore's other businesses, evidently for services and equipment provided to AFC, were the next two largest cash disbursements. Added to the Dent and Bogart loans, these items accounted for ninety-four percent of AFC's cash outlays.

of fraud convictions, in an attempt to show that Moore had been a victim, not a perpetrator, of fraud. Finally, Moore's counsel tried to show that AFC's loans actually did fit within a loose definition of factoring. He produced a certified public accountant who had worked for AFC, who so testified.[6]

The State produced testimony that AFC's loan transactions were inadequately secured. Dent testified that the land he provided as security for his loans was appraised as if developed, when in fact it was not. Dent also testified that he was, with Moore's knowledge, seeking other refinancing for his land, which was already subject to financing from another source. Accordingly, AFC's interest in the land, evidenced by a warranty deed from Dent to AFC, was not recorded, so that Dent could continue to seek other financing using the land as collateral.[7] Bogart testified that he had, at Moore's request, obtained falsely inflated appraisals on the real estate securing his loans.

The AFC accountant testified that AFC's loans had appeared adequately secured by real estate in a 1982 audit he had performed for AFC. However, by 1983, the tremendous accumulation of debt owed to AFC, because of the loan rollovers, threatened to outstrip the appraised value of the land. The accountant also stated that the possibility of inflated appraisals on the real estate would have adversely affected his audits.

Finally, the State's expert found no sign that AFC had ever used due care to verify the existence and collectability of the receivables it purported to be factoring. Invoices purporting to document the transactions were incomplete, were sometimes used to support more than one transaction, and were sometimes lacking altogether. This assessment arose from the expert's analysis of AFC's own records. On cross-examination, he conceded that he had received the records from the prosecution team rather than directly from AFC; the jury was invited to infer that complete AFC records would have shown that it was confirming the validity of the receivables.

The AFC accountant also indicated that AFC had failed to adequately check on the creditworthiness of its clients. While performing an AFC audit in 1983, he noted that Dent and Bogart were seriously behind in their loan repayments. Moore had reacted "defensively" to his warnings that AFC was in financial danger because of these arrearages. The accountant had asked Moore to obtain audited financial statements from Dent and Bogart to confirm that they would make good on their debts, and Moore refused. At that point, the accountant initiated the suspension of the AFC note offering.

Moore's own witnesses were of little help to him. His accountant, as noted, had been among those originally "sounding the alarm" about AFC's activities. Two former AFC officers testified that they had neither been asked by Moore to do anything dishonest, nor seen him do anything dishonest. However, neither had been closely involved in AFC management or in its loan and factoring transactions. In fact, one officer, when asked his position with AFC, "guessed" that he had been secretary-treasurer.

The jury returned general verdicts of guilty on all eight counts. On appeal, Moore raises two claims: (1) his prosecution should have been barred by the general statute of limitations for felonies contained in Utah Code Ann. § 76-1-302; and (2) the evidence was insufficient to support the verdict.

---

**6.** The State's expert specifically rejected counsel's suggestion. He explained that factoring involves the purchase of short-term receivables or third-party notes; AFC's loans did not involve such purchases.

**7.** Evidence showed that AFC commonly secured its loans by taking unrecorded warranty or grant deeds to real property, rather than by recorded trust deeds. This was supposed to give

AFC an advantage by allowing it, in the event of default, to take immediate possession of the land instead of going through a time-consuming foreclosure process. However, because AFC's deeds were unrecorded, its interests in the deeded property would be subordinate to any subsequent recorded interests. *See* Utah Code Ann. § 57-3-3 (1990).

## ANALYSIS

### The Statute of Limitations

■ Moore's first contention is that the general four year statute of limitations contained in the Utah Criminal Code, rather than the five year limitations period for violations of the Utah Uniform Securities Act, should apply to him.[8] Because his prosecution was initiated more than four years but less than five years after the sale of the AFC notes to the eight investors, application of the four year general limitations period would require reversal of Moore's conviction.[9]

Moore argues that the shorter, general felony limitations period should apply because its language allows the application of different limitations periods only "as otherwise provided in this part." Utah Code Ann. § 76–1–302(1)(a) (1990). Since the longer limitations period for Securities Act violations is not found in "this part," i.e., the Criminal Code, argues Moore, it must yield to the shorter limitations period.

We are unpersuaded. We note that the legislature has only recently amended section 76–1–302 of the Utah Criminal Code to make its limitations periods applicable "except as otherwise provided," eliminating the words "in this part." Utah Code Ann. § 76–1–302(1) (Supp.1990) (effective April 23, 1990). However, limits on the Criminal Code's applicability have been in place ever since its 1973 enactment: "The provisions of this code shall govern the construction of, the punishment for, and defenses against any offense defined in this code or,

except where otherwise provided or the context otherwise requires, any offense defined outside this code...." Utah Code Ann. § 76–1–103(1) (1990) (emphasis added). The Securities Act, which defines the offense for which Moore was prosecuted, provides a statute of limitations for that offense. Section 76–1–103 of the Criminal Code clearly allows the application of that limitations period in this case.

■ In addition, we note that Utah's appellate courts have had numerous occasions to decide, when confronted with seemingly conflicting statutes, which should control. It has been consistently held that specific statutes prevail over general statutes. See, e.g., Williams v. Public Service Comm'n of Utah, 754 P.2d 41, 48 (Utah 1988); Millett v. Clark Clinic Corp., 609 P.2d 934, 936 (Utah 1980). Limitations periods contained within specific statutes also control over those of more general statutes. Perry v. Pioneer Wholesale Supply Co., 681 P.2d 214, 216 (Utah 1984) (in action brought under Uniform Commercial Code, Code's limitations period prevails over that for contracts in writing generally); Floyd v. Western Surgical Assocs., 773 P.2d 401, 404 (Utah Ct.App.1989) (in medical malpractice action, Health Care Malpractice Act limitations period controls over that for fraud and mistake). Finally, a statute of limitations included in the same act which defines a crime applies to that crime unless otherwise clearly provided. State v. Lavoto, 776 P.2d 912, 913 (Utah 1989). Here, Moore's charged crime was defined in the more specific Utah Uni-

---

**8.** The general provision, Utah Code Ann. § 76–1–302 (1990), provides, in relevant part:

(1) Except as otherwise provided in this part, prosecutions for other offenses are subject to the following periods of limitation:

(a) a prosecution for a felony or negligent homicide shall be commenced within four years after it is committed....

The statute of limitations for violations of the Utah Uniform Securities Act, contained in Utah Code Ann. § 61–1–21 (Supp.1990), provides: "No indictment or information may be returned or complaint filed under this chapter more than five years after the alleged violation."

**9.** Because the statute of limitations argument was not raised in the trial court, we would normally not consider it on appeal. However,

there is a split of authority on whether a criminal statute of limitations defense is waived if not raised to the trial court. See, e.g., People v. Chadd, 28 Cal.3d 739, 170 Cal.Rptr. 798, 621 P.2d 837 (en banc), cert. denied, 452 U.S. 931, 101 S.Ct. 3066, 69 L.Ed.2d 431 (1981) (statute of limitations is jurisdictional and can be raised for first time on appeal); Sidote v. State, 94 Nev. 762, 587 P.2d 1317 (1978) (per curiam) (even if jurisdictional, must be raised in trial court). We are unaware of any Utah case deciding whether a criminal statute of limitations argument must be raised at trial to be preserved on appeal. Because the State at oral argument specifically agreed that the statute was jurisdictional and not waivable, we proceed to the merits of Moore's argument here.

form Securities Act, which included its own limitations period. That five year limitations period controls.

## Sufficiency of the Evidence

■ Moore next contends that the evidence was insufficient to support his conviction. Our power to review a jury verdict on this ground is quite limited. We view the evidence, along with the reasonable inferences from it, in the light most favorable to the verdict. *State v. Gardner,* 789 P.2d 273, 285 (Utah 1989). We will reverse a jury's guilty verdict only if, so viewed, the evidence and its inferences are so "inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Petree,* 659 P.2d 443, 444 (Utah 1983). *See also State v. Walker,* 743 P.2d 191, 192 (Utah 1987); *State v. McClain,* 706 P.2d 603, 605 (Utah 1985); *State v. McCardell,* 652 P.2d 942, 945 (Utah 1982). The jury, not the appellate court, weighs the evidence and assesses witness credibility; so long as some evidence and reasonable inferences support the jury's findings, we will not disturb them. *See State v. Booker,* 709 P.2d 342, 345 (Utah 1985).

■ Applying this standard of review, we find that the evidence was sufficient to show that Moore violated Utah Code Ann. § 61–1–1(2). A violation of this section requires a showing that the defendant misrepresented a material fact, either affirmatively or by omission, directly or indirectly, in connection with the offer, sale, or purchase of any security. Here, the State alleged at least three such misrepresentations by Moore.

First, each investor prominently recalled the description of factoring as presented by the AFC prospectus and sales representative Bingham. It is reasonable to infer that this description was an important, material factor in each investor's decision to purchase the AFC notes. Coupled with the evidence that AFC was never primarily engaged in factoring, but merely attempted to disguise its loan transactions as factor-

ing, the jury was amply justified in finding that Moore had, through the prospectus and Bingham, misled the investors about AFC's primary business.

Second, the record contains evidence showing that, contrary to representations recalled by the investors, AFC's loan outlays were not adequately secured. Even if the jury accepted the assertion that Bingham's glowing report of the extent of collateral backing up AFC's transactions was unauthorized, evidence of inaccurate and deliberately inflated appraisals on the real estate collateral belied the prospectus statement that AFC would protect its transactions with adequate security. This evidence came from several sources besides Bogart, characterized by Moore's counsel as "a liar and outright fraud." In any case, assessing Bogart's credibility was a jury function.

Third, there was evidence supporting a finding that, contrary to statements made in the prospectus, AFC failed to use due care to verify the existence and collectability of accounts purchased for factoring. This finding was supported by examination of AFC records by the State's expert witness, as well as testimony from others, that many of these "accounts" were known by AFC to be nonexistent.

## Marshaling the Evidence

■ We conclude with a comment on what we perceive to be the proper way to brief an appeal of a jury criminal conviction on the ground of insufficient evidence. Here, Moore has vigorously urged essentially the same points raised at trial. However, our standard of review makes it clear that we are not a trial court. In civil appeals from bench trials, Utah's appellate courts have, since 1985, required appellants to "marshal all the evidence in support of the trial court's findings and then demonstrate that even viewing it in the light most favorable to the court below, the evidence is insufficient to support the findings." *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985). If the appellant fails to so marshal the evidence, the appellate court need not consider the challenge to its suffi-

ciency. *Id.* In *Cambelt Int'l. Corp. v. Dalton,* 745 P.2d 1239, 1242 n. 1 (Utah 1987), the Utah Supreme Court reaffirmed this standard with respect to civil jury trials. Most recently, the marshaling requirement has been applied to criminal bench trials. *State v. Moosman,* 794 P.2d 474, 475–76 (Utah 1990). Thus, the marshaling requirement applies to bench trials, where the standard of review under U.R.C.P. 52(a) is a "clearly erroneous" standard, and to civil jury trials, where the appellate courts are even more deferential, and view the evidence and all possible inferences in a light most favorable to the jury verdict. *See State v. Walker,* 743 P.2d 191, 192–93 (Utah 1987).

The process of marshaling the evidence serves the important function of reminding litigants and appellate courts of the broad deference owed to the fact finder at trial. Such deference is especially appropriate where the fact finder is a jury, whose common sense is a valued buffer between the parties. We believe that this deference is appropriate and important in both civil and criminal cases. Marshaling also aids the appellate courts in deliberations and in the opinion-writing process. Therefore, we adopt the "marshal the evidence" standard for use in criminal appeals from jury verdicts where sufficiency of the evidence is at issue. Because we have not previously applied this requirement, we dispose of Moore's sufficiency of the evidence argument on the merits. However, in subsequent cases, defendants will be required to marshal the evidence in support of the verdict in order to have their sufficiency of the evidence claims dealt with on the merits.

The verdict is affirmed.

BENCH and BILLINGS, JJ., concur.