STATE of Utah, Plaintiff and Appellee,

v.

Gregory Lee FARROW, Defendant and Appellant.

No. 950432–CA.

Court of Appeals of Utah.

June 13, 1996.

John O. Christiansen, Beaver, for Appellant.

Todd A. Utzinger, Asst. Atty. Gen., Criminal Appeals Div., Salt Lake City, for Appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

## OPINION

BILLINGS, Judge:

Defendant Gregory Lee Farrow appeals his convictions of assault, a class B misdemeanor, in violation of Utah Code Ann. § 76–5–102 (1995), possession of a handgun by a felon, a third degree felony, in violation of Utah Code Ann. § 76–10–503(3) (1995), and possession of a controlled substance, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a) (1994). We affirm.

## FACTS

On November 5, 1994, a Beaver City Police Officer, Cameron Noel, received a telephone call from a Cedar City Police Officer informing him that an instance of "spousal abuse" had occurred in Beaver and that the victim, A.F., was staying at a "safe house" in Cedar City. That same day, Officer Noel drove to

Cedar City and interviewed A.F. at the Cedar City Police Department.

A.F. informed Officer Noel of three separate instances of violence. The first instance occurred on April 14, 1994 in front of the Beaver City Tri–Mart, defendant's employer. A.F. was eight-months pregnant and defendant's mother was taking A.F. to a doctor's appointment and wanted to stop by the Tri–Mart to see defendant. A.F. and defendant were then separated, and defendant was angry because A.F. had applied for public assistance. A.F. told Officer Noel that as she was seated in her mother-in-law's car, defendant "leaned into the car ... about two inches from [A.F.'s] face" and told her she "couldn't have [her] child" and threatened to take A.F.'s money. A.F. stated defendant grabbed her purse and tried to pull it from her shoulder. When A.F. resisted, defendant "grabbed [her] arm, ... threw her to the ground onto [her] stomach, and began hitting [her] in the back of the head."

A.F. stated defendant was about to strike her in the stomach when his mother told him she was going to call the police if he did not stop. Defendant's mother started toward a telephone and defendant went after her. A.F. got back into the car and locked the doors. Defendant's mother returned to the vehicle and took A.F. to her doctor's office. A.F. stated she was bruised and sore for approximately one week following this incident.

The couple's baby was born on April 22, 1994, and they attempted a reconciliation. During this brief reconciliation, the couple continued to experience marital difficulties. A.F. also indicated that, during this time, she had tape recorded incidents in which defendant had threatened to kill her and the baby. A.F. then described a second incident occurring on October 10, 1994. A.F. was in the couple's apartment when defendant arrived home from work. She informed defendant "things just weren't working out and [that they would] probably be better off apart." A heated argument ensued. Defendant threatened to kill himself, pulled out a gun, and placed the muzzle to his head. A.F. told defendant she did not believe he would kill himself "because [he] was too strong." De-

fendant replied, "You want to bet? I'll show you." Because defendant had threatened to kill her and the baby in the past, A.F. feared for her life and decided it would be best if she "backed down."

By October 21, 1994, A.F. had decided their marriage was over. While defendant was at work, she packed her belongings and the things she needed to take care of the baby. She contacted a friend and her mother and brother in Cedar City and asked them to come to Beaver to pick her up. While A.F. was waiting to be picked up, defendant phoned her and asked whether she "loved him." She replied she was unsure and that she did not "think it's going to work." Approximately one minute later, defendant entered the apartment. Defendant told A.F., "You're not taking nothing. You're not going to take baby blankets, you're not taking nothing." Defendant tore a gold necklace from around her neck. Defendant then asked where the baby was. A.F. told him the baby was asleep, and defendant asked where she was sleeping. When A.F. remained silent defendant went upstairs and A.F. followed. Fearful that defendant would take the baby, A.F. grabbed her. Defendant wrestled the child from A.F.'s arms and began running out of the door. A.F. followed defendant outside as he got into his car with the baby and began to back out of the driveway. A.F. ran back into the apartment to call 911. Defendant stopped his car and ran into the apartment where he ripped the phone cords from the wall. Defendant pushed A.F. and she pushed back to get away from him. Defendant grabbed A.F. around the neck and hit her in the mouth hard enough to give her a "fat lip." A.F. began to plead as defendant held her down on the couch, choking her.

Just as defendant told A.F. he would kill her, A.F.'s friend arrived. She saw A.F.'s fat lip and the red marks on A.F.'s neck and back. The three spoke for a while and defendant insisted he would not let A.F. leave the house until he knew he could take the baby with him "because he did not want [A.F.] to have her." A.F.'s mother and brother arrived soon thereafter and A.F. asked her brother to go to the police station.

Her brother returned, but the police never arrived.

A.F. successfully convinced defendant to let her leave and to take the baby. She then went to defendant's mother's home to pick up the baby's walker. While she was there, defendant's mother warned A.F. that "for [her] safety, [she] should immediately get into a safe house." A.F. and the baby went to her mother's home, but eventually moved into a safe house for battered women in Cedar City.

When Officer Noel first arrived in Cedar City to interview A.F., the Cedar City police informed him that defendant had been seen in the area and that he had been stopped in the parking lot of a local grocery store with a weapon in the back seat of his car. After Officer Noel completed his November 5 interview with A.F., he returned to Beaver. Upon his return, he attempted to contact the Beaver County Attorney, but was told he was out of town for the weekend. Officer Noel then met with Beaver County Sheriff, Ken Yardley, and one of his deputies, John Chambers. Based upon the information Officer Noel had gathered, he concluded he had probable cause to believe defendant had committed several counts of assault. He also believed defendant posed an ongoing threat of violence to A.F. Officer Noel therefore told Sheriff Yardley and Deputy Chambers that defendant should be arrested.

The following evening, November 6, 1994, Deputy Chambers saw defendant in front of the Beaver post office. As defendant was entering his vehicle, Deputy Chambers arrested him and informed him that Officer Noel wished to speak to him about an assault charge. Defendant exited the vehicle and locked the doors.

Defendant got into Deputy Chambers's car and listened as he requested a tow truck to retrieve defendant's impounded vehicle. Defendant asked whether he could call and have his parents or his assistant manager pick up his car. Deputy Chambers told him "no" and explained that departmental policy required that vehicles be impounded when the driver is arrested on a public highway.

Defendant expressed concern over the contents of the vehicle and Deputy Chambers assured him that a complete inventory of the vehicle's contents would be recorded and that the vehicle would be protected at the impound lot. Deputy Chambers thereafter asked for the keys to the vehicle, but defendant refused. Sheriff Yardley arrived at the scene to watch defendant's car until the tow truck arrived and Deputy Chambers took defendant to the Sheriff's office. Once defendant was at the Sheriff's office, Officer Noel again informed him that he was under arrest.

The tow truck thereafter delivered defendant's car to the Sheriff's office. In the process of inventorying the contents of defendant's vehicle, the police counted the money in the bank bags on defendant's front seat, recovered a "gun glove" containing a handgun and two loaded gun clips, and found methamphetamine placed between the pages of the vehicle's owner's manual.

Defendant was charged with one count of aggravated assault, two counts of assault, one count of possession of a controlled substance, and one count of possession of a handgun by a convicted felon. At the hearing on defendant's motion to suppress the evidence obtained as a result of his warrantless arrest and the ensuing inventory search of his impounded vehicle, the trial court determined Officer Noel was "respond[ing] to a domestic violence call" when he went to Cedar City to interview A.F. regarding her allegations of abuse by defendant. The court further found, pursuant to section 77–36–2(3)(a) of the Utah Domestic Violence Act, defendant's warrantless arrest was proper, as was the inventory search incident to his arrest.

Following a jury trial, defendant was found guilty of one count of assault and possession of a controlled substance. In a subsequent bench trial, defendant was found guilty of possession of a handgun by a convicted felon. The trial court sentenced defendant to concurrent terms of zero to five years for the possession charges and a term of up to six months for the assault charge. Defendant appeals.

## ISSUE AND STANDARD OF REVIEW

 Defendant raises several issues on appeal. However, we only address whether the trial court erred when it determined defendant's warrantless arrest was proper pursuant to Utah Code Ann. § 77–36–2 (1995) (repealed 1995) because Officer Noel was "respond[ing] to a domestic violence call."[1] The trial court's interpretation of section 77–36–2 presents a legal question which we review for correctness. *US Xpress v. Utah State Tax Comm'n*, 886 P.2d 1115, 1117 (Utah App.1994). We review the trial court's application of section 77–36–2 to the facts in the instant case with more deference. *State v. Scieszka*, 897 P.2d 1224, 1226 (Utah App.1995); *accord State v. Pena*, 869 P.2d 932, 939–40 (Utah 1994) (providing trial court should be accorded a "measure of discretion" when applying law to the facts).

## ANALYSIS

 Defendant does not challenge the trial court's finding that Officer Noel had probable cause to believe defendant had committed an incident of domestic violence, that defendant had used a dangerous weapon during one incident, and that there was an ongoing threat of future violence to A.F. Rather, he contends the trial court erred in finding Officer Noel was "respond[ing] to a domestic violence call" when he arrested defendant sixteen days after the last incident of abuse. *See* Utah Code Ann. § 77–36–2(3)(a) (1995) (repealed 1995).[2] He concedes section 77–36–2 provides law enforcement with war-rantless arrest powers in domestic violence cases and, in fact, requires arrest in certain circumstances, but argues the statute only applies in emergency situations occurring during or immediately after an incident of domestic violence.[3]

Section 77–36–2(3)(a) provides:

In addition to the arrest powers described in Section 77–7–2, *when a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer shall arrest without a warrant or issue a citation* to any person that he has probable cause to believe has committed any of the offenses described in Subsection 77–36–1(2)(a) through (i).

*If the peace officer has probable cause to believe that there will be continued violence against the alleged victim, or if there is evidence that the perpetrator has either recently caused serious bodily injury or used a dangerous weapon in the domestic violence offense, the officer shall arrest and take the alleged perpetrator into custody, and may not utilize the option of issuing a citation* under this section.

*Id.* (repealed 1995) (emphasis added).

### A. Plain Language

In interpreting a statute, we " ' "first examine the statute's plain language and resort to other methods of statutory interpretation only if the language is ambiguous." ' " *US Xpress v. Utah State Tax Comm'n*, 886 P.2d 1115, 1117 (Utah App.1994) (citations omit-

1. Defendant raises several additional arguments regarding the propriety of the impoundment and inventory search of his vehicle and the integrity of the chain of custody of the handgun and methamphetamine discovered in the vehicle. Defendant either fails to cite any case law supporting these claims or makes no effort to present any record evidence suggesting the police did not follow proper procedure when the car was inventoried and the evidence examined. We therefore find these arguments without merit and decline to address them. *See State v. Carter*, 776 P.2d 886, 888–89 (Utah 1989); *State v. Amicone*, 689 P.2d 1341, 1344 (Utah 1984).

Finally, defendant claims the jury verdict finding him guilty of assault and possession of a controlled substance is not supported by sufficient evidence. When challenging a jury verdict, a defendant must marshal all the evidence supporting that verdict and then demonstrate why that evidence is insufficient to support the conviction. Because defendant has failed to meet his marshaling burden, we likewise decline to consider this claim. *State v. Moore*, 802 P.2d 732, 739 (Utah App.1990).

2. Utah Code Ann. § 77–36–2(3)(a) was repealed July 1, 1995. *See* Domestic Abuse Procedures Act, ch. 300, § 30, 1995 Laws of Utah 1022. Nearly identical language appears at Utah Code Ann. § 77–36–2.2(2)(a) & (b) (Supp.1995).

3. Defendant makes no state or federal constitutional challenge to his warrantless arrest, under either the Fourth Amendment to the U.S. Constitution or Article One Section Fourteen of the Utah Constitution, and we therefore do not reach any constitutional issues.

ted). The plain language of section 77–36–2(3)(a) does not require a response to an emergency situation for the warrantless arrest provisions to apply. The statute contains no temporal requirement. We refuse to read a temporal requirement into the language of this statute where the legislature easily could have provided for a time requirement had it so desired. Only four states have chosen to require a temporal element in their domestic violence statutes, and each state has done so explicitly.[4] Further, our plain reading of section 77–36–2 is supported by the entire domestic violence statutory scheme, its legislative history, and sound public policy.

## B. Context of the Legislation

"[A] fundamental rule of statutory construction requires that a statute 'be looked at in its entirety and in accordance with the purpose which was sought to be accomplished.'" *State v. Scieszka*, 897 P.2d 1224, 1227 (Utah App.1995) (quoting *Salt Lake City v. Salt Lake County*, 568 P.2d 738, 741 (Utah 1977)). Thus, this court must harmonize subsection (3)(a) with the balance of the domestic violence legislation. *See State v. Bishop*, 753 P.2d 439, 468 (Utah 1988). In relevant part, subsection (2) makes clear "[t]he primary duty of peace officers responding to a domestic violence call is to protect the parties and enforce the laws allegedly violated." Utah Code Ann. § 77–36–2(2) (1995) (repealed 1995). Likewise, subsection (1) requires that "[a]ll training relating to the handling of domestic violence complaints by law enforcement personnel shall stress *protection of the victim, enforcement of criminal laws* in domestic situations, and availability of community resources." *Id.* § 77–36–2(1) (repealed 1995) (emphasis added). Finally, when read in its entirety, the Spouse Abuse Procedures Act (the Act), Utah Code Ann. §§ 77–36–1 through –9 (1995) (repealed 1995), stands for the proposition that because domestic violence is serious in nature and has a high likelihood of

repeated violence, incidents of domestic abuse require the mandatory and immediate attention of law enforcement. Thus, the Act as a whole demonstrates the legislature's desire to grant law enforcement broad authority to make warrantless arrests and even to require arrest in some cases of domestic violence, such as the one presented in this case.

## C. Legislative Intent

Likewise, a "primary rule of statutory interpretation is to give effect to the intent of the legislature." *Nixon v. Salt Lake City Corp.*, 898 P.2d 265, 268 (Utah 1995). By enacting section 77–36–2, the Utah State Legislature expressed, in statutory form, a public policy to arrest perpetrators of domestic violence. In part, the legislature observed that domestic violence is cyclical and often does not end with a single occurrence or incident. Rather, "[w]omen do not seek [intervention] after a single beating, but after several." Recording of Utah House Floor Debates, 45th Legislature, General Session (January 25, 1983) (Statement of Rep. Maxfield). Because of fear for the victim's safety and that of the victim's children, "[i]n many cases, ... women will endure years of abuse before [leaving their homes.]" *Id.* (Statement of Rep. Maxfield). Moreover, the legislature deemed the expanded arrest procedures included in section 77–36–2 necessary to "ensure that law enforcement officers will understand what their responsibilities are and rights in making arrests and assisting [domestic violence] victims." *Id.* (Statement of Rep. Maxfield). Finally, allowing law enforcement to make arrests upon finding probable cause to believe that an incident of domestic violence has occurred permits officers to "[p]rotect victims from further domestic [abuse]." *Id.* (Statement of Rep. Maxfield).

Again, in 1991, when the mandatory arrest provisions of subsection (3)(a) were added, the legislature provided that when notified of "a domestic violence situation, ... wherever

---

4. *See* Minn.Stat. Ann. § 629.341 (West 1996) (mandating arrest if abuse occurred within twelve hours of arrest); Mo. Ann. Stat. § 455.085(1) (Vernon Supp.1995) (same); R.I. Gen. Laws § 12–29–3(3) (1995) (mandating arrest within twenty-four hours of alleged crime); Wis. Stat. Ann. § 968.075(2)(b) (West 1995) (mandating arrest only if report of abuse is received within twenty-eight days of alleged incident).

the arresting officer sees ... evidence of ... domestic violence ..., [the officer] *must arrest* [the perpetrator] and take him into the judicial system." Tape of Utah Senate Floor Debates, 49th Legislature, General Session (January 18, 1991) (Statement of Sen. Storey) (emphasis added). The legislature expressly recognized that domestic violence is often not reported immediately, and therefore that police officers often are not able to respond to domestic violence calls when the abuse is then in progress. This legislative history supports our reading of the warrantless arrest power as not limited to emergency situations.

### D. Public Policy

Finally, we look to related case law and "'relevant policy considerations'" for guidance in construing section 77–36–2(3)(a). *State v. Child Support Enforcement*, 888 P.2d 690, 692 (Utah App.1994) (quoting *Schurtz v. BMW of N. Am.*, 814 P.2d 1108, 1112 (Utah 1991)). In *Strollo v. Strollo*, 828 P.2d 532, 534 (Utah App.1992), this court liberally construed similar domestic violence legislation. In *Strollo*, this court reversed the trial court's refusal to enter a protective order in a case where the last incident of abuse occurred seven months prior to the plaintiff's request for the order. *Id.* at 535. This court broadly interpreted the Cohabitant Abuse Act, Utah Code Ann. § 30–6–1(2) (Supp.1991), and found that a party seeking entry of a protective order need not establish "immediate peril." Rather, the court stated, the plain language of "[t]he statute clearly protects those who are reasonably in fear of physical harm resulting from past conduct coupled with a present threat of future harm." *Strollo*, 828 P.2d at 535. "Otherwise, the prophylactic purpose of the statute would be defeated. We do not think the legislature intended such a result." *Id.* Thus, this court found that so long as the statute is applied as to effect the legislative purpose, temporal proximity is not an express element of the statute.

In light of the plain language of the statute buttressed by the entire statutory scheme, relevant legislative history, and the foregoing policy considerations, we conclude the trial court's refusal to limit application of subsection (3)(a)'s mandatory arrest procedures to require temporal proximity to the alleged abuse was correct.

■ We further determine the court's conclusion that Officer Noel properly arrested defendant under this warrantless arrest statute was proper. In the instant case, the parties were involved in an abusive relationship, wherein defendant physically assaulted A.F. on at least three occasions. Following the October 21st episode, A.F. left the marital home and moved in with her mother. Although she was residing fifty miles away, A.F. still felt threatened and therefore she moved into a "safe house" in Cedar City. Defendant does not challenge the trial court's findings that Officer Noel had probable cause to believe defendant had committed an incident of domestic violence, that he had used a dangerous weapon during an incident, and that there was an ongoing threat of future violence to A.F., thus triggering the mandatory arrest provisions of section 77–36–2(3)(a). Moreover, during the two week period between the last incident and A.F.'s report to Officer Noel, defendant had been stopped at a local grocery store in Cedar City with a weapon in his car. Furthermore, when A.F. reported the alleged incidents of domestic violence, Officer Noel drove to Cedar City to interview A.F. that same day, and he arrested defendant within twenty-four hours of receiving A.F.'s complaint. There was simply no undue delay in law enforcement's response. Based upon these facts, we conclude the trial court correctly determined Officer Noel was "respond[ing] to a domestic violence call" when he arrested defendant without a warrant on November 6, 1994.

### CONCLUSION

We conclude the trial court did not err when it found, under the facts in this case, Officer Noel was responding to a domestic violence call when he interviewed A.F. on November 5, 1994 and arrested defendant without a warrant on November 6, 1994 pursuant to section 77–36–2(3)(a). We therefore affirm the trial court's denial of defendant's

motion to suppress and affirm his convictions.

GREENWOOD, J., concurs.

BENCH, Judge (concurring in the result):

As indicated by the main opinion, section 77–36–2(3)(a) unambiguously provides that "when a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer *shall* [1] arrest without a warrant or [2] issue a citation." Utah Code Ann. § 77–36–2(3)(a) (1995) (emphasis added). The option of issuing a citation is eliminated if "the peace officer has probable cause to believe that [a] there will be continued violence against the alleged victim, or [b] there is evidence that the perpetrator has either recently caused serious bodily injury or used a dangerous weapon in the domestic violence offense." *Id.*

In the instant case, the trial court explicitly found that the "potential for harm to her [the victim] is ongoing." The court further found that the officer had "probable cause to believe there was continued—there could be continued violence against the victim." Defendant does not challenge these fact-sensitive determinations. *See State v. Poole,* 871 P.2d 531, 533 (Utah 1994) (stating that appellate courts afford a measure of discretion to trial court's determination of probable cause). In view of those facts, and under the plain meaning of the statute, the officer had no choice but to arrest defendant. As pointed out by the main opinion, defendant does not challenge the statute on constitutional grounds. *See* main opinion at note 3.

Having held that the plain meaning of the statute mandated the arrest of this defendant, any consideration of rules of statutory construction used in interpreting ambiguous statutes is unwarranted. "When language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction." *Salt Lake Child & Family Therapy Clinic, Inc. v. Frederick,* 890 P.2d 1017, 1020 (Utah 1995). Likewise, any discussion of legislative intent and public policy is both unnecessary and improper. *World Peace Movement of Am. v. Newspaper Agency Corp.,* 879 P.2d 253, 259 (Utah 1994) ("Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations.").

I therefore concur only in the result.