STATE of Utah, Plaintiff and Appellee,

v.

Tyrone LEMONS, Defendant and Appellant.

No. 910410–CA.

Court of Appeals of Utah.

Dec. 14, 1992.

Stephen A. Laker, Ogden, for defendant and appellant.

R. Paul Van Dam and Charlene Barlow, Salt Lake City, for plaintiff and appellee.

Before BILLINGS, Associate P.J., and JACKSON and RUSSON, JJ.

BILLINGS, Associate Presiding Judge:

Defendant Tyrone Lemons appeals a jury conviction of attempted criminal homicide in violation of Utah Code Ann. § 76–4–101 (1990) and Utah Code Ann. § 76–5–203 (Supp.1992). Defendant claims he was denied a fair trial by the use of a walk-through metal detector at the courtroom door and the evidence presented at trial was insufficient to prove beyond a reasonable doubt he had the requisite intent for criminal homicide. We affirm defendant's conviction.

## FACTS

We cite the facts from the record in a "light most favorable to the jury verdict." *State v. Perdue*, 813 P.2d 1201, 1202 (Utah App.1991). Defendant's conviction was based on his firing a shot which seriously injured Pete Romero (Romero) in the early morning hours of August 26, 1990.

On August 25, 1990, defendant had been drinking and driving around Ogden with his friends. Romero had also been drinking and driving around with his friends. Defendant's brother, Maurice Lemons, and one of Romero's friends, John Delgado (Delgado) were involved in an on-going conflict. In the afternoon and evening of August 25, 1990, the two groups engaged in

name-calling and the throwing of rocks and bottles at each other.

During the course of the night the two groups were involved in a series of confrontations. First, defendant, defendant's brother, and a friend left the car they were in and approached Delgado and his group who had gotten out of another car. Defendant's group retreated because they thought Delgado had a gun. Another of defendant's friends, who had remained in the car, however, told defendant that Delgado carried a bottle not a gun.

After this confrontation, at approximately 1:30 a.m. on the morning of August 26, 1990, Delgado, the victim Romero, and several other people met at a park to go to a party. Again the two groups engaged in name-calling.

Following this confrontation, defendant, Jeffrey Tracy (Tracy), and Fidel Archuleta (Archuleta) left the park to get a shotgun from Tracy's house. After returning to the park with the gun, defendant, Tracy, and Archuleta approached Delgado's group which consisted of five to ten people. Romero, the victim, was among the people in Delgado's group. Defendant's group yelled at Delgado encouraging him to fight. Delgado's group then ran towards the defendant, Tracy, and Archuleta. Defendant fired the shotgun in the air but Delgado's group continued to approach. Defendant fired a second shot in the air and began to back away. Defendant retreated under a streetlight and reloaded with the help of Archuleta. Archuleta then retreated further. Defendant waited until some of defendant's group came closer and then fired a third shot seriously injuring Romero, a member of Delgado's group.

Robert Hruska (Hruska) lived in a house near the park where the shooting occurred. Hruska saw defendant fire the third shot. At 3:00 a.m. on August 26, 1990, Hruska had just turned off his television and was going to bed. Hruska was awake in his bedroom when he heard a "muffled report." He then heard a second louder report which he identified as a firearm. At this point Hruska went to a window that faced the park and looked out. Hruska saw a group of people running in a scattered fashion. He also saw defendant standing in the street aiming a gun. Because defendant was standing underneath a street light, Hruska was able to see defendant aim the gun. Hruska testified he thought defendant was going to shoot an animal because he had the muzzle of the gun pointing slightly downwards. After aiming for five to seven seconds defendant fired. Hruska then saw a body, later identified as Romero, fall into view from behind the shopping cart where he had been hiding. Based on these facts, the jury convicted defendant of attempted criminal homicide.

During the trial a metal detector was used at the courtroom door. Everyone entering the courtroom passed through the metal detector. The Second District Court in Ogden did not routinely use a metal detector to screen people entering the courtroom. In a pre-trial conference defendant objected to the use of the metal detector. The trial court found the metal detector was necessary for the protection of defendant, the general public, and the court, in view of the high feelings in the community concerning the case.

## RIGHT TO A FAIR TRIAL

■ Initially, defendant claims he was denied a fair trial because of the selective use of a metal detector at the courtroom door during his trial. The extent to which security measures are necessary to ensure a safe and orderly proceeding is within the sound discretion of the trial court and we will not overrule that exercise of discretion unless it was clearly abused. *State v. Mitchell*, 824 P.2d 469, 473 (Utah App. 1991).

■ It is well established that " '[a] principle ingredient of due process is that every defendant is entitled to a fair and impartial trial,' " including the presumption of innocence. *Mitchell*, 824 P.2d at 473 (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir.1973), *cert. denied, Kennedy v. Gray*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974)). Included within the

presumption of innocence is the " 'physical indicia of innocence.' " *Mitchell*, 824 P.2d at 473 (quoting *Kennedy*, 487 F.2d at 104). However, a defendant's right to the physical indicia of innocence must be weighed against "the essential state policy of providing security in the courtroom." *Id.*

Although we have never considered the precise issue of the use of metal detectors to ensure an orderly and safe trial,[1] we did consider the necessary balancing of the accused's right to the indicia of innocence against the need for security in the courtroom in *State v. Mitchell*. In *Mitchell* we held that the trial court did not abuse its discretion by requiring the defendant to be shackled because of his violent criminal history and his pattern of escape attempts. *Id.*

The United States Supreme Court has considered less intrusive security measures in balancing a defendant's right to the indicia of innocence against the need for a secure and orderly trial. In *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the Court considered the use of uniformed security guards in the courtroom to supplement normal security measures. The Court concluded the presence of the guards did not deny the defendant a fair trial. *Id.* at 570, 106 S.Ct. at 1347. The Court stressed that the use of uniformed guards, unlike dressing the defendant in prison garb or placing him in shackles, was not an inherently prejudicial practice. *Id.* The Court pointed out that a wide range of inferences could be drawn from the presence of the guards other than the defendant was particularly dangerous, including a necessity to protect the proceedings from external disruptions. *Id.* at 568–69, 106 S.Ct. at 1346. Thus, the use of uniformed guards did not unduly detract from the defendant's presumption of innocence.

Several other jurisdictions have considered the use of metal detectors at the courtroom door and have found their use did not deprive the defendant a fair trial. In *State v. Shipley*, 429 N.W.2d 567 (Iowa Ct.App.1988), the Iowa Court of Appeals specifically addressed the use of metal detectors at the courtroom door and found that the security practice did not violate the defendant's right to a fair trial when there had been anonymous death threats against the defendant. The *Shipley* court found that the use of metal detectors in Shipley's trial were not inherently prejudicial. *Id.* at 570. The court reasoned that unlike shackling, metal detectors do not single out the accused or necessarily create the presumption that the defendant is violent or dangerous. *Id.* The court also found the defendant had not met his burden of proving actual prejudice from the use of this non-inherently prejudicial security device. *Id.*[2]

The Second District Court in Ogden found that a walk-through metal detector was imperative in light of the high feelings in the community regarding the trial. The court found that the metal detector was as much for the defendant's protection as it was for the protection of the general public and the court.

The trial court did not abuse its discretion in allowing the use of the metal detector. The selective use of a metal detector is not inherently prejudicial as the shackling was in *Mitchell*. Defendant has not demonstrated any actual prejudice from the use of this security device. The facts indicate additional precautions were necessary to maintain order and security for the

---

1. In *State v. Cornwall*, 810 P.2d 484, 486–88 (Utah App.1991), a panel of this court approved the routine use of metal detectors in conducting administrative searches at courthouse entrances.

2. *See also United States v. Carter*, 815 F.2d 1230, 1231–32 (8th Cir.1987) (use of a metal detector outside the courtroom upheld); *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, 845–46 (1981), *cert. denied, Greenawalt v. Arizona*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981) (no abuse of discretion when spectators and jurors were screened with metal detecting device); *State v. Myrick*, 228 Kan. 406, 616 P.2d 1066, 1076–77 (1980) (no prejudice when everyone entering courtroom was required to submit to metal detector inspection); *State v. Cooper*, 660 S.W.2d 184, 185–86, (Mo.Ct.App.1983) (defendant not deprived of fair trial when metal detector used near rear door of courtroom); *State v. Davis*, 547 S.W.2d 482, 488–89 (Mo.Ct.App.1976) (uniformed police and metal detectors at main courtroom entrance not prejudicial).

proceeding. The jury could have drawn inferences not necessarily associated with defendant's innocence such as protecting the proceeding from outside influences as in *Holbrook,* or protecting the defendant as in *Shipley.* In conclusion, we hold defendant was not deprived a fair trial.

### SUFFICIENCY OF THE EVIDENCE

Next, defendant claims there was insufficient evidence to establish beyond a reasonable doubt that he knowingly or intentionally attempted to cause the death of Romero when he fired the shotgun. The State claims defendant has failed to marshal all the evidence in support of the jury's verdict and therefore we should not reach this issue. Furthermore, the State claims there is sufficient evidence to support a finding that defendant intended to shoot Romero.

To determine whether the evidence was sufficient to support the jury's verdict, "we view the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict." *State v. Perdue,* 813 P.2d 1201, 1207 (Utah App.1991). We reverse only when the evidence, so viewed, " 'is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.' " *Id.* (quoting *State v. Pedersen,* 802 P.2d 1328, 1330 (Utah App.1990), *cert. denied,* 815 P.2d 241 (Utah 1991)).

 In challenging the sufficiency of the evidence, the burden on the defendant is heavy. Defendant " 'must marshal all evidence *supporting* the jury's verdict and must then show how this marshaled evidence is insufficient to support the verdict even when viewed in the light most favorable to the verdict.' " *State v. Scheel,* 823 P.2d 470 (Utah App.1991) (quoting *State v.*

*Perdue,* 813 P.2d at 1207); *accord State v. Moore,* 802 P.2d 732, 738–39 (Utah App. 1990).

 We agree with the State that defendant has failed to marshal the evidence in support of the verdict. In particular, defendant failed to marshal the evidence which demonstrates he intended to shoot the victim. Defendant's brief fails to refer to any of Hruska's testimony. Hruska testified that he saw defendant aim the gun for five to seven seconds with the muzzle pointing slightly downwards before firing the third shot. He then saw the victim fall from behind a shopping cart where defendant had aimed and fired the gun. Based on this testimony alone a reasonable juror could have concluded that defendant intended to cause the death of Romero.[3] Therefore, we affirm defendant's conviction.

JACKSON and RUSSON, JJ., concur.

---

**3.** Even if we were to consider the issue on the merits, the result would not differ. Defendant claims he did not have the requisite intent for attempted criminal homicide. However, the record contains evidence upon which a reasonable jury could conclude defendant intentionally or knowingly attempted to kill Romero. *See* Utah Code Ann. § 76–5–203 (Supp.1992). Intent "need not be proved by direct evidence, but may

be inferred from defendant's conduct." *State v. Lopez,* 789 P.2d 39, 43 (Utah App.1990) (quoting *State v. Davis,* 711 P.2d 232, 234 (Utah 1985)). Based on Hruska's testimony that defendant aimed the shotgun for five to seven seconds before firing at Romero a reasonable jury could conclude that defendant took a substantial step toward intentionally causing the death of Romero.