2002 UT 2

**STATE of Utah, Plaintiff and Appellee,**

v.

**Eric Thomas DANIELS, Defendant and Appellant.**

**No. 970313.**

Supreme Court of Utah.

Jan. 11, 2002.

---

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., Salt Lake City, for plaintiff.

G. Fred Metos, Candice A. Johnson, Salt Lake City, for defendant.

WILKINS, Justice.

¶ 1 Defendant Eric Thomas Daniels was charged with aggravated murder due to his involvement in the death of Lonnie Blackmon at the Central Utah Correctional Facility in Gunnison, Utah. Defendant was tried in a courtroom located inside of the prison facility, and a unanimous jury found him guilty of first degree murder. At sentencing, upon a vote of ten of twelve, the jury decided defendant should be sentenced to life in prison without parole. Defendant appeals, raising four issues. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal. *E.g., State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

¶ 3 Defendant, an inmate at the Central Utah Correctional Facility (CUCF), was involved in the death of another inmate, Lonnie Blackmon, who was stabbed to death.

¶ 4 Prior to the stabbing, defendant and other inmates, Paul Payne and Troy Kell, were involved in racially-related verbal and physical altercations with other inmates, including Blackmon. Defendant, Kell, and Payne devised a plan to attack Blackmon. Defendant, Kell, and Payne planned to submit medical requests to visit the prison medical facility, and a medical request was to be forged and submitted for Blackmon, in hopes that all would be outside of their cells at the same time, permitting them to attack Blackmon. These medical requests were submitted to prison officials.

¶ 5 On July 6, 1994, defendant, Kell, and Blackmon were released from their cells after lunch to visit the medical facility. Just before lunch, a shank—a crude piece of metal roughly sharpened to be a homemade knife of sorts—and a handcuff key were delivered to Kell's cell. Payne's medical request was denied, so he and another inmate, John Cannistraci, requested permission to shower downstairs in order to leave their cells. Officer Richard Whimpey, the floor officer responsible for transporting the prisoners to the showers and the medical facility, first retrieved Payne and Cannistraci and secured them in separate showers downstairs. Officer Whimpey then handcuffed defendant, connecting defendant's handcuffs to a leather belt with a chain. Because defendant was already downstairs and did not need to descend the stairs, Officer Whimpey also placed leg irons on defendant. Then, Officer Whimpey retrieved Kell from the second floor, handcuffing him and connecting the handcuffs to a belt, but not shackling his feet so Kell could descend the stairs by himself. Once Kell had descended the stairs, Officer Whimpey handcuffed another inmate, and then Blackmon, who Whimpey also handcuffed and belted, but did not shackle. Officer Whimpey then escorted Blackmon down the stairs.

¶ 6 While Officer Whimpey was handcuffing and escorting Blackmon, Kell moved near Payne's shower, with his back to the control room. As he moved toward the showers, Kell told defendant to keep his eyes open. A short time later, Kell stepped away from the

shower area, free from his handcuffs. Defendant approached Payne, who told defendant to be careful, and defendant then loosened his waist restraint. Moments later, Kell produced a shank.

¶ 7 Kell, without handcuff restraints, shank in hand, attacked Blackmon from behind, striking him in the neck with the shank as he stood just outside a cell door. Kell described the punch as a "good hit" because of "the amount of blood coming out of the wound [in Blackmon's neck]." From the initial blow, blood stained the door where Blackmon stood. Indeed, because of the amount of blood spurting from Blackmon's neck, Kell believed he had "severed a vein . . . or an artery."

¶ 8 During the altercation, Blackmon, with restrained hands but unshackled legs, attempted to protect himself. Blackmon kicked at his assailants and retreated toward the shower area where he continued kicking with his back to a wall. Eventually he was grabbed and pulled by defendant, who, with assistance from Kell, forced Blackmon further toward the showers. Defendant had somehow loosened or removed his belt, and with his hands handcuffed but no longer restrained behind him, assisted in the attack of Blackmon.

¶ 9 Once defendant and Kell moved Blackmon near the showers, one of the two inmates in the showers grabbed Blackmon through the shower door bars from inside his shower. Then, defendant grabbed Blackmon's legs, and Blackmon fell to the ground. Kell continued to stab Blackmon, stabbing him in the back, chest, neck, face, and eyes while defendant held Blackmon's legs. One inmate testified that the shank made a distinct "suction noise" as Kell stabbed Blackmon. Defendant also held Blackmon's legs out and off the ground while Cannistraci choked Blackmon through the shower bars. Kell was covered with blood, and, according to more than one witness, blood was everywhere. At one point, Blackmon pleaded with Kell to stop stabbing him because he was dying. Despite this plea, Kell continued stabbing Blackmon and defendant remained on his legs. Eventually, defendant let go of defendant's legs and attempted to get up.

His restraints were tangled with Blackmon's, however, and he had to untangle them before he could move away from Blackmon whom he left lying on the ground. At one point defendant told Kell that Blackmon was still breathing, after which Kell inflicted more wounds with the shank. Blackmon died as a result of the attack, and defendant was charged with aggravated murder.

¶ 10 Following two evidentiary hearings, the trial court determined to hold defendant's trial in a courtroom located inside the Central Utah Correctional Facility in Sanpete County, Utah. This decision was based on security risks particular to defendant, defendant's criminal history, defendant's prison disciplinary record and prison history both before and after the stabbing, and logistical problems, particularly the security risks associated with trying the case in either of the two other courtrooms located in the county.

¶ 11 At trial, defendant testified that he, Kell, and Payne intended to physically injure Blackmon, but not kill him. Defendant admitted that he forged Blackmon's medical request. Defendant also admitted that he intended to hurt Blackmon and beat him severely, but he denied plotting to kill him. Defendant further testified that he did not realize Kell was stabbing Blackmon with a shank, and not simply beating him, until after he was already on Blackmon's legs and just before Blackmon pleaded with Kell to stop because he was dying. Defendant claimed that he tried to move away once he realized Kell was stabbing Blackmon, but he could not because his shackles were tangled with Blackmon's.

¶ 12 Other inmates testified regarding what defendant told them about the stabbing. One inmate testified that defendant told him about the feeling and sound of the shank entering and exiting Blackmon's body, and that he held Blackmon's legs so that Kell could get a "better stab at the heart." Another inmate testified that defendant told him he obtained the piece of metal from which the shank was fashioned from a prison door. Yet another inmate testified regarding discussions he had with defendant during which defendant described the blood coming out of Blackmon's neck. In response to tes-

timony from other inmates about what he had told them, defendant claimed he exaggerated his story. More than one inmate also testified that he heard defendant encourage Kell to stab Blackmon in the eyes.

¶ 13 At the conclusion of the testimony, defendant requested that the court instruct the jury on manslaughter, but the trial court refused to do so. The trial court did, however, instruct the jury on aggravated murder and on the lesser included offense of murder. Despite being instructed on murder, the jury convicted defendant of aggravated murder. Following the guilt phase, the trial proceeded to the sentencing phase, and ten of twelve jurors voted to sentence defendant to life in prison without parole.

¶ 14 Defendant appeals. He contends that (1) he was denied the right to a fair trial because he was tried in a courtroom located inside a prison; (2) the trial court committed prejudicial error when it failed to instruct the jury on manslaughter; (3) his sentence imposed by a vote of ten of twelve jurors should be vacated because article I, section 10 of the Utah Constitution guarantees a unanimous jury at sentencing; and (4) a 1997 amendment to section 76–3–207(4) of the Utah Code, which changed the sentencing rules from requiring jury unanimity to a vote of ten of twelve, violates section 68–3–3 of the Utah Code, a prohibition on the retroactive application of statutory amendments, and the ex post facto clauses of the Utah and United States Constitutions.

## ANALYSIS

## I. WHETHER DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL

¶ 15 The right to a fair trial is a fundamental constitutional right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. See e.g., *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). In protecting this right, the United States Supreme Court has declared that "the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Estelle*, 425 U.S. at 504, 96 S.Ct. 1691 (citations omitted). We must therefore apply close judicial scrutiny to the question of whether trying a prison inmate in a prison courtroom, when he is charged with committing a crime inside the prison, violates his right to a fair trial.

¶ 16 Both defendant and the State acknowledge that the United States Supreme Court has decided that questions pertaining to the fairness of a trial should be subjected to close judicial scrutiny. However, defendant also concedes that an abuse of discretion standard has been applied by the court of appeals in *State v. Mitchell*, 824 P.2d 469 (Utah Ct.App.1991), and *State v. Lemons*, 844 P.2d 378 (Utah Ct.App.1992), both of which indicate that an abuse of discretion standard is appropriate when addressing whether the right to a fair trial has been violated.[1]

¶ 17 Countless events occur at trial, many of which, given certain circumstances, may legitimately be alleged to have prejudiced a defendant's right to a fair trial. Even though the same constitutional right, the right to a fair trial, may be affected by one or more different events, the events are oftentimes dissimilar and are subject to review under different standards. For example, whether to grant a motion for a mistrial or whether to admit or exclude evidence, matters generally left to the discretion of the trial court, may be alleged to have impacted the defendant's right to a fair trial. Rulings on such issues would be reviewed under an abuse of discretion standard. See, e.g., *State v. Decorso*, 1999 UT 57, ¶ 38, 993 P.2d 837 (reiterating that a trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard). At the other end of the standard of review continuum, a trial court's decision to use a jury instruction may be alleged to have impacted the defen-

---

1. In *State v. Mitchell*, 824 P.2d 469, 473 (Utah Ct.App.1991), the court of appeals relied on *Kennedy v. Cardwell*, 487 F.2d 101, 107–10 (6th Cir.1973), and *United States v. Hack*, 782 F.2d 862, 867 (10th Cir.1986), in concluding that the decision whether to restrain an accused during trial rests in the sound discretion of the trial judge to be reviewed for an abuse of discretion.

dant's right to a fair trial, and such a conclusion would be reviewed for correctness. *See, e.g., State v. Archuleta*, 850 P.2d 1232, 1244 (Utah 1993) (declaring that whether a jury instruction correctly states the law is a question of law reviewed for correctness). We therefore must look to the question as presented to the trial court to determine the appropriate degree of appellate review.

¶ 18 As we explained in *State v. Peña*, trial courts are generally presented with either questions of law or questions of fact. 869 P.2d 932, 935 (Utah 1994). We generally review a trial court's findings of fact under the deferential clearly erroneous standard. *Id.* at 935–36 (Utah 1994). Trial courts have primary responsibility for making determinations of fact and must be given deference in their factfinding role because they are in a better position to assess credibility and determine facts than an appellate court is. Appellate courts therefore owe broad deference to the trial court engaged in a factfinding role. *Id.* Questions of law, on the other hand, are reviewed for correctness. *Id.* at 936. When reviewing a determination of law, an appellate court decides the matter for itself and does not defer in any degree to the trial court's determination because it is the primary role of the appellate courts to say what the law is and ensure that it is uniform throughout the jurisdiction. *Id.*

However, while the universe of questions presented for review is often characterized as consisting only of mutually exclusive questions of fact or law, "there is really a third category—the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law." *Id.* We have stated, as a general rule, that we review such mixed questions as determinations of law for correctness. *Id.* at 939; *see also, e.g., State v. McDonald*, 922 P.2d 776, 780–81 (Utah Ct.App.1996) (mixed question of whether counsel was waived knowingly and intelligently was reviewed for correctness, but leaving a "reasonable measure of discretion" to the trial court because the issue is highly fact dependent).

¶ 19 The question before the trial court in the instant case, whether conducting defendant's trial inside the prison deprived him of his right to a fair trial, falls within this third category, a mixed question of law and fact. The trial court gathered facts and made certain factual findings, findings that neither party challenges on appeal.[2] The trial court then made a legal determination of how those facts fit within the rules of law. As in *Peña*, we conclude that this mixed question is reviewable for correctness. That said, because the instant case is a mixed question of law and fact, we further conclude

2. At the hearings on whether defendant's trial should be held inside the Central Utah Correctional Facility or at a courthouse located outside of the prison, the State and defendant stipulated to trying the case in the Sanpete County courthouse. The State also indicated, however, a desire to avoid challenge on appeal and to respect the security plan prepared by the Sanpete County Sheriff and the Utah Department of Corrections. The trial court concluded that defendant's right to a fair trial and the security concerns would be better served by trying defendant inside the CUCF. The trial court expressed concern that defendant presented a significant risk of escape and violence, enumerating the following as reasons for trying defendant inside the prison: (1) defendant participated in the planning and attack of Blackmon; (2) officers found a handcuff key in defendant's cell after the attack; (3) defendant made racially-related threats after the attack; (4) officers overheard banging and grinding noises, followed by toilet flushing after the attack; (5) defendant threw urine on a prison control officer and said "This is for you ... for testifying against me in court"; (6) defendant

was involved in a prison riot in 1993, during which inmates destroyed property and removed a steel door from a shower room and used it as a battering ram to break down the door between the unit and the hallway around the control room; (7) excluding witnesses, at least twenty-three non-inmate citizens would be present at trial; and (8) defendant and Kell would likely testify at trial.

In its order, the trial court described the three courtrooms in Sanpete County and explained that of the two located in Manti, only the smaller courtroom has adequate seating for fourteen jurors. The Department of Corrections presented a security plan for trying the case in this courtroom, insisting that defendant be shackled, but proposing that a floor-length fabric be placed around counsel table to conceal the shackles from the jury. This option would also have involved two plain-clothed security officers near defendant and others in the courtroom. Because of the size and security concerns presented by this courtroom, the Department of Corrections recommended that the trial be conducted inside the prison facility.

that the trial court's application of certain factual circumstances to the law regarding the right to a fair trial also merits a certain measure of discretion. Precisely how much deference we cannot say, other than that a sufficiently careful review is necessary to assure the constitutional right to a fair trial is protected. Due to the fact-dependent nature of this issue, we afford the trial court a measure of deference in its application of the law to the facts of this case. As a result, we subject the trial judge's decision to, as the United States Supreme Court describes it, close judicial scrutiny.

¶ 20 The crux of defendant's argument on appeal is that by trying him in the CUCF, the trial court created an inherently prejudicial situation that violated his right to a fair trial. The right to a fair trial is a fundamental constitutional right secured by the due process and equal protection guarantees of the Sixth and Fourteenth Amendments. *See e.g., Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Estelle v. Williams,* 425 U.S. 501, 502–03, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Central to this right "is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of ... other circumstances not adduced as proof at trial." *Holbrook,* 475 U.S. at 567, 106 S.Ct. 1340 (quoting *Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)). The presumption of innocence is a component of this guarantee of the right to a fair trial and has become a basic element of our criminal justice system. *Holbrook,* 475 U.S. at 567–68, 106 S.Ct. 1340; *Estelle,* 425 U.S. at 503, 96 S.Ct. 1691. Even though the trial judge has broad latitude to control and manage the proceedings to preserve the integrity of the trial process, when a courtroom action or arrangement is challenged as inherently prejudicial, we consider whether the practice presents an unacceptable risk of bringing into play impermissible factors that might erode the presumption of innocence. *State v. Harrison,* 2001 UT 33, ¶ 6, 24 P.3d 936, 940 (citing *Holbrook,* 475 U.S. at 570, 106 S.Ct. 1340, and *Estelle,* 425 U.S. at 505, 96 S.Ct. 1691). If the challenged practice is not inherently prejudicial, the judgment of the trial court will be affirmed. *Id.* (citing *Holbrook,* 475 U.S. at 572, 106 S.Ct. 1340). If the practice is inherently prejudicial, we must then consider whether the prejudicial practice is outweighed by any competing essential state interests. *See Holbrook,* 475 U.S. at 568–69, 106 S.Ct. 1340. We therefore analyze first whether conducting the trial of an inmate charged with committing a murder inside a prison is inherently prejudicial, presenting an unacceptable risk of introducing impermissible factors that impinge upon the presumption of innocence.

¶ 21 Compelling an accused to wear identifiable prison clothing at a jury trial, absent exceptional circumstances, has been held to be inherently prejudicial. *Estelle,* 425 U.S. at 512–13, 96 S.Ct. 1691. This is because the defendant's clothing is "so likely to be a continuing influence throughout the trial that ... an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 505, 96 S.Ct. 1691. However, where an inmate is tried in prison clothing for the murder of a fellow inmate, "[n]o prejudice can result from seeing that which is already known." *United States ex rel. Stahl v. Henderson,* 472 F.2d 556, 557 (5th Cir.1973), *cert. denied sub nom. Stahl v. Henderson,* 411 U.S. 971, 93 S.Ct. 2166, 36 L.Ed.2d 694 (1973), *quoted in Estelle,* 425 U.S. at 507, 96 S.Ct. 1691.

¶ 22 Like compelling a defendant to stand trial in prison clothing, compelling defendant in this case to stand trial in a courtroom located inside a prison is likely to be a "continuing influence throughout the trial." *Estelle,* 425 U.S. at 504–05, 96 S.Ct. 1691. However, where the defendant was incarcerated and the alleged crime was committed inside the prison, those facts must inevitably come out at trial. Because the factual circumstances were inevitably going to be, and were, "adduced as proof at trial," *Holbrook,* 475 U.S. at 567, 106 S.Ct. 1340, trying defendant in a courtroom located inside a prison did not present an unacceptable risk of presenting impermissible factors. We reiterate that " '[n]o prejudice can result from seeing that which is already [or inevitably will be]

known.' " *Estelle*, 425 U.S. at 507, 96 S.Ct. 1691 (quoting *Stahl*, 472 F.2d at 557).

¶ 23 Obviously, trying a defendant in prison clothing is different from trying a defendant in a prison courtroom; the impact upon the minds of the jurors may differ. Defendant contends the trial inside the prison was inherently prejudicial because the jurors could have inferred that he was dangerous, not just incarcerated, and that he needed to be separated from the community. We find this argument unpersuasive because the jurors could have drawn several other inferences from the fact that the trial was held inside the prison.

¶ 24 In *Holbrook*, uniformed state troopers sat in the courtroom in addition to the regular security force, and the Supreme Court considered the range of inferences that a juror might reasonably draw from the presence of the officers in determining whether the practice was inherently prejudicial. *Holbrook*, 475 U.S. at 569, 106 S.Ct. 1340. The *Holbrook* Court explained that even though "it is possible that the sight of a security force within the courtroom might under certain conditions 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy,' " *id.* (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 108 (6th Cir.1973)), the presence of uniformed security personnel in a courtroom was different from shackling a defendant and not inherently prejudicial because of "the wider range of inferences that a juror might reasonably draw from the officers' presence," *id.*

¶ 25 Similar to the conclusion in *Holbrook* that the presence of guards need not be interpreted to mean that the defendant was dangerous or culpable, holding defendant's trial in the prison courtroom need not be interpreted to mean that defendant was dangerous or culpable. Alternative inferences suggested in *Holbrook* were that (1) jurors may believe that the officers were present to handle potential disturbances outside the courtroom or (2) to ensure tense courtroom exchanges did not erupt into violence; (3) security officers may be perceived simply as "elements of an impressive drama"; or (4) jurors may not infer anything at all. *Id.* In this case, jurors could have drawn an equally wide range of alternative inferences from the fact that the trial was held inside the prison. The impact was not limited to an inference that the defendant was a dangerous or untrustworthy individual. The jurors could have just as easily inferred that (1) it was preferable to hold the trial inside the prison instead of transporting the inmate witnesses to a courthouse outside of the prison with the attendant financial cost and security risk; (2) holding the trial in the prison courtroom enabled prison officials to testify without requiring them all to travel to the courthouse in Manti; (3) it was necessary for the safety of those involved in the trial to hold the trial in a prison courtroom because many of the witnesses were inmates; (4) the jurors needed to be able to tour the crime scene, which they did, because the incident occurred at the prison; (5) it was simply preferable to hold the trial in a newer, more modern courtroom; (6) the prison courtroom was better equipped to handle spectators or potential security risks from outside groups that may arise from a racially-related homicide; or (7) the jury could have inferred nothing. Thus, it is equally likely that jurors may have inferred that the trial took place in a prison courtroom because of the circumstances surrounding the nature of the case, and that the location of the trial had nothing to do with the defendant's character. It is also probable, indeed our system depends on the assumption that, the jurors inferred nothing and followed their oath, adhering to the instructions given them and impartially applying the law given them to the facts they found in viewing the evidence presented at trial.[3]

---

3. One of the instructions given by the district court is as follows:

The trial is being held in a courtroom in the Department of Corrections' facility at Gunnison, Utah, where the incident occurred which has given rise to the charges against the defendant. By law this has been designated a public courtroom and the location of the trial should not have any impact upon your deliberations or the verdict you return. The presumption of innocence which the defendant is afforded throughout these proceedings is not dependent upon the place of trial, and the rules and provisions of law contained in these instructions as well as the duties of jurors

¶ 26 In view of the variety of factual circumstances which may be presented by different cases, we decline to hold, as a matter of law, that a trial inside a prison is *inherently* prejudicial and thereby violative of the right to a fair trial. *But see, e.g., Ohio v. Lane*, 60 Ohio St.2d 112, 397 N.E.2d 1338, 1340–43 (1979) (holding in part that a criminal trial inside a prison is violative of the right to a fair trial). In some cases it may be prejudicial to hold a trial in a prison courtroom; but to try an inmate in a prison courtroom for a violent crime alleged to have been committed inside a prison by a person incarcerated for a previous conviction does not per se present an unacceptable risk of bringing into play impermissible factors which might erode the presumption of innocence. However, we also point out that to hold a criminal trial in a courtroom located inside a prison or other facility simply because a defendant is already incarcerated, or because to do so would be more safe or convenient, would also be error, absent adequate findings and compelling reasons. A case-by-case evaluation is necessary. Because we conclude that the practice challenged in this case was not inherently prejudicial, we need not engage in a balancing of the risk of unfair prejudice against security interests in this case. The trial court's decision in applying the unchallenged facts to the applicable rule of law was correct.

## II. WHETHER DEFENDANT, HAVING BEEN CHARGED WITH AGGRAVATED MURDER, WAS ENTITLED TO A JURY INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER

¶ 27 When objected to at trial, as here, a trial court's failure to give a requested jury instruction is reviewed under a correctness standard. *See State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992) ("Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness." (citations omitted)). Defendant asked the trial court to give a jury instruction on manslaughter because, he claimed, based on the

evidence presented, there was a rational basis to acquit him of aggravated murder and convict him of manslaughter. The trial court declined to give the requested instruction. Defendant claims he was entitled to such an instruction and cites *State v. Baker*, 671 P.2d 152 (Utah 1983), in support. The State counters, arguing that the district court's failure to instruct the jury on manslaughter was harmless because the jury convicted defendant of aggravated murder, not murder, and a murder instruction was given.

¶ 28 Since murder is also a lesser included offense of aggravated murder, yet more severe than manslaughter, the State argues that where a jury is given the choice between aggravated murder or murder, and selects aggravated murder, the jury obviously would not have chosen manslaughter, and therefore failure to give a manslaughter instruction is harmless error. We agree. Although it was error, the trial court's failure to give the manslaughter instruction requested by defendant was harmless error. Where a jury is instructed on, and has the opportunity to convict a defendant of, a lesser included offense, but refuses to do so and instead convicts the defendant of a greater offense, failure to instruct the jury on another lesser included offense, particularly an offense that constitutes a lesser included offense of the lesser included offense that the jury was instructed on, is harmless error. *See State v. Pearson*, 943 P.2d 1347, 1350–51 (Utah 1997) (holding that failure to give a manslaughter instruction where the jury was instructed on both aggravated murder and the lesser included offense of murder is harmless error when the jury convicts of aggravated murder); *see also State v. Gotschall*, 782 P.2d 459, 463–64 (Utah 1989) (holding that where a jury is instructed on second degree murder and manslaughter and convicts defendant of second degree murder, even if the trial court's failure to instruct the jury on negligent homicide was error, such error was harmless); *cf. State v. Oldroyd*, 685 P.2d 551, 555–56 (Utah 1984) (reversing conviction of assault with intent to commit serious bodily injury where the trial court denied defendant's request for an instruction on the lesser

remain constant without regard to where the trial is held.

included offense of "threatening with a dangerous weapon" because the only options before the jury were to convict of aggravated assault or acquit).

¶ 29 In this case, the jury returned a verdict finding defendant guilty of aggravated murder, thereby rejecting the option of finding defendant guilty of the lesser included offense of murder. As a result, a manslaughter instruction, a lesser included offense of murder, would have been of no consequence. Therefore, the failure by the trial court to instruct the jury on manslaughter was harmless.

## III. WHETHER ARTICLE I, SECTION 10 OF THE UTAH CONSTITUTION GUARANTEES THE RIGHT TO A UNANIMOUS JURY AT SENTENCING

¶ 30 Defendant contends that section 76–3–207 of the Utah Code violates the Utah Constitution. Whether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court. *See State v. Mohi*, 901 P.2d 991, 995 (Utah 1995). Inasmuch as we are ruling on the constitutionality of a statute, we reiterate that a statute is presumed to be constitutional, and any reasonable doubts are resolved in favor of its constitutionality. *Id.; Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 920 (Utah 1993).

¶ 31 Section 76–3–207(4)(c) reads, in pertinent part, "If the jury reports agreement by ten jurors or more to impose the penalty of life in prison without parole, the court shall discharge the jury and shall impose the sentence of life in prison without parole." Utah Code Ann. § 76–3–207(4)(c) (1999). Defendant was sentenced to life in prison without the possibility of parole by a vote of ten of twelve jurors.

¶ 32 Article I, section 10 of the Utah Constitution requires jury verdicts in criminal cases to be unanimous. Utah Const. art. I, § 10; *see also State v. Saunders*, 992 P.2d 951, 966 (Utah 1999). Defendant claims that article I, section 10 requires unanimity in the sentencing or penalty phase, in addition to unanimity in the guilt phase, because a jury

decision in the penalty phase is still a "verdict." He further contends that where a jury is given any responsibility, the unanimity requirement should apply, in part because the framers of the Utah Constitution desired jury reliability, and the goal of reliability is advanced by unanimity in sentencing. The State counters that article I, section 10 does not require unanimous jury sentences because the language of article I, section 10 limits unanimity to guilt proceedings. Further, the State claims historical evidence indicates that the framers intended unanimity on guilt, not sentencing, because jury sentencing did not begin in Utah until 1973.

¶ 33 The critical aspect of any constitutional interpretation is to divine the intent and purpose of the framers. *Salt Lake City Corp. v. Prop. Tax Div. of the Utah State Tax Comm'n*, 1999 UT 41, ¶ 23, 979 P.2d 346. That said, "our case law confirms that the starting place for analysis of a constitutional provision is the language of the provision in question," *In re Worthen*, 926 P.2d 853, 866 (Utah 1996) (citing *Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 920–21 (Utah 1993)), so we look first to the language chosen by the framers to reflect their intent. In order to arrive at a proper interpretation of the constitutional provision in question, we may also consider historical evidence, sister-state law, and policy arguments supported by independent research materials to assist us. *Id.* at 866–67 (citing *Whitehead*, 870 P.2d at 921 n. 6).

¶ 34 The language of article I, section 10 reads, in relevant part, "In criminal cases the verdict shall be unanimous." In criminal cases, the term verdict has traditionally meant the jury's decision regarding the guilt of the defendant, not the pronouncement of sentence. *See* 1888 Compiled Laws of Utah § 5075 (A verdict at trial after a defendant pleaded not guilty was either "guilty" or "not guilty"); 1876 Compiled Laws of Utah § 2244 (verdict in capital cases was "guilty" or "not guilty"). In fact, at common law, the role of the jury was limited to the question of guilt or innocence and the decision on punishment or sentencing was left to the trial judge. *See, e.g., State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312, 1326

(1984); *Fogg v. Commonwealth*, 215 Va. 164, 207 S.E.2d 847, 849 (1974). The framers of the Utah Constitution undoubtedly used the term verdict to mean the jury's decision following the guilt phase of a criminal trial, and not the sentencing phase, simply because at the time the Utah constitution was ratified, judges, not juries, sentenced defendants. *See* 1888 Compiled Laws of Utah §§ 5075 (A verdict at trial after a defendant pleaded not guilty was "guilty" or "not guilty"), 5101 ("Upon a plea of guilty of a crime distinguished or divided into degrees, *the court must, before passing sentence*, determine the degree.") (emphasis added); 1876 Compiled Laws of Utah § 1920 (stating jury could recommend life sentence instead of death penalty in first degree murder cases). There is no indication that the framers contemplated jury sentencing, beyond a possible sentencing recommendation to the judge, let alone any support for defendant's contention that jury sentencing must be unanimous. Jury sentencing decisions in Utah did not begin until 1973. *See* Utah Code Ann. § 76-3-207 (1999) (originally enacted in 1973); Utah Code Ann. § 76-3-207 (Supp.1973); *cf.* Utah Code Ann. § 76-30-4 (1953) (penalty for first degree murder was death, unless jury recommended otherwise, but sentencing remained "in the discretion of the [trial] court"). Consequently, we conclude that article I, section 10 does not guarantee a unanimous jury in the sentencing phase. We therefore hold that section 76-3-207 of the Utah Code does not violate article I, section 10 of the Utah Constitution in allowing a less than unanimous jury decision in sentencing defendant.

¶ 35 Defendant places significant reliance on language extracted from the opinion of the United States Supreme Court in *Andres v. United States*, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948), claiming it stands for the proposition that where a jury is given the responsibility of determining sentence, the unanimity requirement applies just as it does when the jury decides guilt. *Andres*, however, does not stand for this proposition; and the language relied upon by defendant is dicta, not critical to the holding.

¶ 36 The issue before the Court in *Andres* that is relevant to this case was whether jury instructions regarding unanimity were proper—instructions lifted from 18 U.S.C. § 567. In deciding this issue, the Court addressed "[t]he proper construction of 18 U.S.C. § 567." *Id.* at 748, 68 S.Ct. 880. The federal statute in *Andres* provides:

> In all cases where the accused is found guilty of the crime of murder in the first degree, or rape, the jury may qualify their verdict by adding thereto 'without capital punishment'; and whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to imprisonment for life.

*Id.* at 742 n. 1, 68 S.Ct. 880 (quoting 18 U.S.C. § 567). The Court interpreted this language to require that a "jury's decision upon both guilt and whether the punishment of death should be imposed must be unanimous." *Id.* at 749, 68 S.Ct. 880. The Court's holding turns on the interpretation of the statute, and the Court did not hold that the federal constitution guarantees that any time a jury is given responsibility it must be unanimous. Consequently, we conclude that *Andres* is not applicable in this case.

IV. WHETHER A 1997 AMENDMENT TO SECTION 76-3-207(4) OF THE UTAH CODE VIOLATES SECTION 68-3-3 OF THE UTAH CODE AND THE EX POST FACTO CLAUSES OF THE UTAH AND UNITED STATES CONSTITUTIONS

¶ 37 Defendant argues that the 1997 amendment to section 76-3-207(4) violates section 68-3-3 of the Utah Code, a prohibition on retroactive application of statutory amendments, and the ex post facto clauses of the Utah and United States Constitutions. Statutory and constitutional interpretation presents questions of law. *See, e.g., Cache County v. Prop. Tax Div. of the Utah State Tax Comm'n*, 922 P.2d 758, 766 (Utah 1996). Consequently, whether legislation violates section 68-3-3 is a question of law that we review for correctness. Similarly, whether legislation violates the ex post facto clauses of the Utah and United States Constitutions is also a question of law, which

we review for correctness, giving the trial court no deference.

¶ 38 The 1997 amendment to section 76–3–207(4) changed the sentencing rules from requiring jury unanimity to a vote of at least ten of twelve jurors to impose a sentence of life without parole. Defendant claims that the 1997 amendment to section 76–3–207(4) created a significant risk of increased punishment, thereby violating the ex post facto clauses, because at the time of the offense, a sentence of life without parole required a unanimous vote of the jury, but after the enactment of the 1997 amendment, the same sentence now requires only a vote of ten of twelve.

¶ 39 The State, on the other hand, contends that the 1997 amendment does not violate section 68–3–3 because this court has already declared that section 68–3–3 does not prohibit the retroactive application of procedural statutes, and section 76–3–207 is a procedural statute. The State argues that the 1997 amendment does not violate the ex post facto clauses because the test as to whether a statute violates the ex post facto clauses of the Utah and United States' Constitutions is whether the amendment changed the quantum of punishment, not whether it created a significant risk of increased punishment, and the 1997 amendment did not change the quantum of punishment for an aggravated murder conviction.

■■■ ¶ 40 Section 68–3–3 reads, "No part of these revised statutes is retroactive, unless expressly so declared." In interpreting this provision in *State v. Norton*, we reiterated the "long-standing exception to the general rule of nonretroactivity[:] Remedial and procedural amendments apply to accrued, pending, and future actions." 675 P.2d 577, 585 (Utah 1983) (citing *Dep't of Social Servs. v. Higgs*, 656 P.2d 998, 1000–01 (Utah 1982), and *Boucofski v. Jacobsen*, 36 Utah 165, 172, 104 P. 117, 119 (Utah 1909)), *overruled on other grounds by State v. Hansen*, 734 P.2d 421 (Utah 1986). "For purposes of this exception, a case is pending 'from the time of

its commencement until its final determination on appeal.' " *Id.* (quoting *Boucofski*, 36 Utah at 172, 104 P. at 120).

■■■ ¶ 41 The 1997 amendment to section 76–3–207(4) is procedural. It has nothing to do with the substance of defendant's crime or the amount of punishment specified for it; it deals with the procedure by which the jury arrives at a decision on the amount of punishment to impose from sentencing alternatives. *See* Utah Code Ann. § 76–3–207(4) (1999). Moreover, defendant's action was pending at the time the 1997 amendment was enacted. The killing occurred on July 6, 1994, defendant was charged by information on July 19, 1994, and a final determination on appeal had not yet occurred when the amendment was enacted and became effective in 1997. Consequently, because the 1997 amendment is procedural, and because defendant's action was a pending action at the time the 1997 amendment was enacted and took effect, section 68–3–3 does not prohibit the application of the amendment in this case.

¶ 42 We have interpreted the Utah ex post facto clause, Utah Const. art. I, § 18,[4] consistently with the United States Supreme Court's interpretation of the ex post facto clause found in the United States Constitution, U.S. Const. art. I, § 10, cl. 1.[5] *Norton*, 675 P.2d at 585 n. 5 ("This Court recognizes no distinction between the protection against ex post facto laws provided by the Utah and the United States Constitutions." (citations omitted)). We do not interpret our constitutional provision any differently from the federal provision today, and therefore our analysis applies to both.

¶ 43 In *Norton* we said that an ex post facto law is one that punishes as a crime an act previously committed, which was innocent when done; one that makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was

---

4. "No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be passed."

5. "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...."

committed. *Norton,* 675 P.2d at 585 (citing *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (additional citation omitted)), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds by State v. Hansen,* 734 P.2d 421 (Utah 1986). Since our decision in *Norton* and the United States Supreme Court's decision in *Dobbert,* the United States Supreme Court has attempted to clarify the federal constitutional prohibition against ex post facto laws.

¶ 44 In *Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), the Court discussed the English common law roots of the prohibition against ex post facto laws and reiterated Mr. Justice Chase's comment in *Calder v. Bull,* "The expressions' *ex post facto laws,*' are *technical,* they had been in use long before the Revolution, and had acquired an appropriate meaning, by *Legislators, Lawyers,* and *Authors.*" 3 Dallas 386, 390, 1 L.Ed. 648 (1798) (Chase, J.), *quoted in Carmell,* 529 U.S. at 521, 120 S.Ct. 1620. The *Carmell* Court then quoted with approval Mr. Justice Chase's definition of ex post facto laws:

> 'I will state *what laws* I consider *ex post facto laws,* within the *words* and the *intent* of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*'

*Carmell,* 529 U.S. at 522, 120 S.Ct. 1620 (quoting *Calder,* 3 Dallas at 390).

¶ 45 The instant case falls within Mr. Justice Chase's third category, if any. The question is whether the 1997 amendment to section 76–3–207(4) constitutes a "law that *changes the punishment,* and inflicts a *great-*er punishment, than the law annexed to the crime, when committed."

¶ 46 The most recent guidance from the United States Supreme Court regarding this category of ex post facto laws is *Garner v. Jones,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). In *Garner,* the Court considered whether a Georgia law that extended the time between parole hearings from three years (the interval between parole hearings at the time of the offense) to seven years (the time between hearings after the enactment of the law in question) violated the ex post facto prohibition. The Court stated that "[o]ne function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission." *Id.* at 249–250, 120 S.Ct. 1362 (citing *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)). The *Garner* Court also discussed *California Department of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), in which the Court determined that a California statute that changed the frequency of consideration for parole from every year to every three years did not violate the ex post facto proscription. *See Garner,* 529 U.S. at 250, 120 S.Ct. 1362 (discussing *Morales,* 514 U.S. at 507, 115 S.Ct. 1597). In *Garner,* the Court stated, referring to *Morales,* that "[t]he controlling inquiry, we determined, was whether retroactive application of the change in California law created 'a sufficient risk of increasing *the measure of punishment* attached to the covered crimes.'" *Id.* (quoting *Morales,* 514 U.S. at 509, 115 S.Ct. 1597) (emphasis added). The Court then expounded on its holding in *Morales,* stating that the statute did not violate the ex post facto clause because it did not, inter alia, modify the statutory punishment imposed for particular offenses, alter the standards for determining the initial date for parole eligibility, or change the basic structure of California's parole law. *Id.* Later in *Garner* the Court cited *Morales,* quoting from the opinion parenthetically, stating, "After *Collins,* the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage' … but on whether any such change … increases the penalty by

which a crime is punishable." *Garner,* 529 U.S. at 255, 120 S.Ct. 1362 (quoting *Morales,* 514 U.S. at 506–07 n. 3, 115 S.Ct. 1597).

¶ 47 We conclude that the required inquiry is whether, in the abstract, a new law affects the measure or quantum of punishment an existing law can impose, as opposed to whether a new law affects the likelihood that a particular defendant will be sentenced to the greater of possible alternative punishments. This language is consistent with the view articulated by Mr. Justice Chase as approved by the Court in *Carmell:* "Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed." *Carmell,* 529 U.S. at 522, 120 S.Ct. 1620. This formulation does not include laws that change the *possibility* of punishment or inflict the *risk* of greater punishment as ex post facto. It prohibits laws that change the measure of available punishment. To phrase the inquiry as whether the law creates a significant risk of increasing one's punishment expands the concept of ex post facto beyond that held shortly after the adoption of the Constitution. We defer to the position described by Mr. Justice Chase, who, in 1789, defined ex post facto as a term derived from English common law that was well-known to the founders, but "necessarily requires some explanation; for naked and without explanation it is unintelligible, and means nothing." *Carmell,* 529 U.S. at 521, 120 S.Ct. 1620. We believe his definition reflects the intent and design of the framers, and is consistent with a reasonable reading of subsequent case law from the United States Supreme Court.[6]

¶ 48 In amending section 76–3–207(4), our legislature did not increase the measure of punishment available to a defendant convicted of aggravated murder—the punishment remained either death, life in prison without the possibility of parole, or life in prison with the possibility of parole. It did, however, create an increased chance that the sentence of life without parole would be imposed by requiring a less-than-unanimous decision by the jury on that question.

¶ 49 Accordingly, we conclude that the 1997 amendment does not violate the ex post facto prohibitions of the Utah or the United States Constitutions. To paraphrase the language of Mr. Justice Chase, while the 1997 amendment may *increase the possibility* that a more onerous punishment will be imposed, *it does not change the punishment* or inflict a *greater* punishment than the law annexed to the crime, when committed. The range of punishment attached to the crime of aggravated murder, death to life in prison with the possibility of parole, remained constant and unaffected by the 1997 amendment.

### CONCLUSION

¶ 50 Defendant was not denied the right to a fair trial by being tried in the courtroom at the Central Utah Correctional Facility. The trial court's failure to instruct the jury on manslaughter was harmless. Defendant's sentence imposed by a vote of ten of twelve jurors under section 76–3–207 of the Utah Code is valid; article I, section 10 of the Utah Constitution does not guarantee a unanimous jury at sentencing. Application of the 1997 amendment to section 76–3–207(4) to defendant does not violate section 68–3–3 of the Utah Code or the ex post facto clauses of the Utah and United States Constitutions. As a result, defendant's conviction is affirmed.

Associate Chief Justice RUSSON and Justice DURRANT concur in Justice WILKINS' opinion.

HOWE, Chief Justice, concurring:

¶ 51 I concur. I write to point out that the 1997 amendment to section 76–3–207(4) which changed the requirement of jury unanimity to a vote of at least ten of the twelve jurors to impose the sentence of life without parole does not necessarily create a signifi-

---

6. In *Garner,* the Court also intimated that "there [may] inhere[ ] in ex post facto doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression...." *Garner,* 529 U.S. at 253, 120 S.Ct. 1362 (citation omitted). In this case the 1997 amendment did not deprive defendant of notice of the potential penalty for the crime; he was always on notice that the punishment for aggravated murder ranged from death to life with or without the possibility of parole.

cant risk of increased punishment to criminal defendants. Before the statute was enacted, a juror in a capital case might be torn between imposing the death penalty or giving a life sentence knowing that the defendant might be paroled after serving only part of a life sentence. The statute offers another alternative to the death penalty, by allowing the life sentence to be without the possibility of parole. The 1997 amendment simply made that alternative more available to a defendant. Although the defendant in the instant case characterizes the amendment as increasing the risk of punishment for his crime, in reality the amendment may have been the means by which he avoided the death penalty.

DURHAM, Justice, concurring:

¶ 52 I concur in the result of the majority opinion, and all of its reasoning, except the approach to the constitutional analysis contained in section IV. In that portion of the opinion, the majority declines to undertake a separate and distinct analysis of the ex post facto clauses of the Utah and United States Constitutions, noting that its analysis "applies to both." However, the opinion cites only to federal case law without specifying whether our holding is mandated by an adequate and independent state ground. In addition, the opinion does not contain a "plain statement" clarifying whether the federal cases are being "used only for the purpose of guidance ... [or whether they] themselves compel the result that the court has reached." *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). I fear that this approach might be construed as a commitment to move in lockstep with future federal development of ex post facto doctrine. I continue to be a proponent of independent state constitutional analysis on federalism grounds, believing we should use a primacy approach or dual analysis approach whenever possible. *See State v. Kennedy*, 295 Or. 260, 666 P.2d 1316, 1319 (1983) (stating that "a practice of deciding federal claims without attention to possibly decisive state issues can create an untenable position for this state's system of discretionary Supreme Court review"); *see also* Hans A. Linde, *E. Pluribus–Constitutional Theory*

*and State Courts,* 18 Ga. L.Rev. 165, 174–80 (1984) (proposing that courts should apply state constitutional law first, reaching federal constitutional claims only when state law fails to provide protection); Hans A. Linde, *Without Due Process: Unconstitutional Law in Oregon,* 49 Or. L.Rev. 125, 133–35 (1970) (explaining that when a decision rests on independent state grounds, along with federal constitutional claims, federal courts are bound by the cited state constitutional premise, not the "identical" federal premise); Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts,* 63 Tex. L.Rev. 977, 980–82 (1985) (discussing the importance of the plain statement requirement of *Michigan* ).