2005 UT 9

**STATE of Utah, Plaintiff and Appellee,**

v.

**Thomas Arthur GREEN, Defendant and Appellant.**

**No. 20020725.**

Supreme Court of Utah.

Feb. 1, 2005.

712

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., Salt Lake City, for plaintiff.

John R. Bucher, Salt Lake City, for defendant.

NEHRING, Justice:

¶ 1 Defendant Thomas Arthur Green appeals his conviction for rape of a child. Mr. Green presents eleven arguments on appeal which, when distilled, mount two central attacks on his one conviction: (1) that the trial court erred when it did not dismiss the child rape charge against him because the applicable statute of limitations had run; and (2) that the trial court did not have jurisdiction to hear the case. We agree with the trial court's rulings on both issues and affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Twelve-year-old Linda Kunz "betrothed" herself to her stepfather, Thomas Arthur Green, in February 1985. When Linda was thirteen years old, she "spiritually married" Mr. Green during a vacation in Mexico. Two months after the marriage, Linda conceived a child, Melvin Morris Green, who was born four months after her fourteenth birthday. Two months later, in order to avoid charges of child molestation, Mr. Green legally married Linda pursuant to Utah law.

¶ 3 In April or May 1999, the Juab County Attorney David O. Leavitt, began to investigate allegations that Mr. Green was guilty of bigamy, in violation of Utah law. The impetus for the investigation was a telephone call Mr. Leavitt received from a news reporter asking that he comment on Mr. Green's polygamous lifestyle. As foundation for his in-

vestigation, Mr. Leavitt gathered videotape depicting Mr. Green and his wives as they appeared on various television broadcasts wherein they described and defended their polygamous lifestyle. On one broadcast, Linda and Mr. Green admitted they had married when Linda was fourteen years old. Following up on that admission, Mr. Leavitt reviewed school, welfare, and vital statistics information and, from them, deduced that Linda had been thirteen years of age when she conceived Melvin Green. This evidence led Mr. Leavitt to conclude that the sexual intercourse that resulted in Melvin's conception constituted rape of a child.

¶ 4 In April 2000, the State filed an information charging Mr. Green with one count of rape of a child, four counts of bigamy, and one count of criminal nonsupport. The trial court later granted Mr. Green's motion to sever the rape of a child charge,[1] which is the issue before us on this appeal.

¶ 5 The trial court held a preliminary hearing, and at its conclusion, Mr. Green moved to dismiss the charge. The grounds for his motion to dismiss are the same as those Mr. Green brings to us on appeal: (1) that the statute of limitations had run, and (2) that the court lacked both jurisdiction and venue over the offense. The magistrate denied the motion and bound over Mr. Green for trial on the charge of rape of a child.

¶ 6 Mr. Green then sought to quash the bindover based on a reprise of his earlier arguments. He contended that law enforcement officials had received numerous reports of the alleged rape at a time that would have triggered the running of the statute of limitations and caused it to expire before he was charged. Mr. Green also claimed the court lacked jurisdiction because the sexual relations that formed the basis of the child rape charge occurred in Mexico.

¶ 7 The trial court held six evidentiary hearings on the challenge to the bindover and entered factual findings on each issue raised by Mr. Green. It determined that the State had established that the statute of limi-

---

1. In March 2002, a jury convicted Mr. Green of criminal nonsupport and four counts of bigamy. Mr. Green appealed his bigamy convictions to

this court. The convictions were affirmed in *State v. Green*, 2004 UT 76, 99 P.3d 820.

tations did not bar the prosecution of Mr. Green. The trial court also turned away Mr. Green's jurisdictional claim, reasoning that the State had adequately demonstrated that Mr. Green had committed criminal solicitation and conspiracy within Utah to commit rape of a child in Mexico.

¶ 8 After Mr. Green waived his right to a jury trial, the trial court convicted him of rape of a child, sentencing him to a prison term of five years to life to be served concurrently with his sentences for bigamy and criminal nonsupport. *See supra* note 1. This appeal followed.

¶ 9 Before turning to the substantive issues on appeal, we address, again, the vexing and recurring problem posed by parties who bring appeals to us that are handicapped by inadequate compliance with the Utah Rules of Appellate Procedure. Rules of appellate procedure benefit all parties by providing specific, step-by-step procedures for filing, briefing, and arguing an appeal. They thereby prevent an "undue burden [upon] the judiciary's time and energy." *MacKay v. Hardy,* 973 P.2d 941, 949 (Utah 1998). In this case, our concern centers on the appellant's failure to follow appellate requirements for adequate briefing and marshaling of evidence. *See* Utah R.App. P. 24(a)(9), (j).

¶ 10 The rules of appellate procedure require adequate briefing. *See id.* at 24 (detailing the proper format of appellate briefs). The need for a codified mandate that an issue be adequately briefed appears odd. One would reasonably expect a party who goes to the effort to seek appellate review of an issue to expend the energy necessary to persuade us of the merit of his or her cause. Yet, with surprising frequency, this does not occur.

¶ 11 In *State v. Gamblin,* 2000 UT 44, 1 P.3d 1108, we noted that an appellant's brief was inadequate because it provided no "meaningful legal analysis"; instead, the appellant provided only "one or two sentences stating his argument generally . . . and then broadly conclud[ed] that [he] was entitled to relief." *Id.* at ¶ 7. A brief which does not fully identify, analyze, and cite its legal arguments may be "disregarded or stricken" by the court, and we may fine the responsible attorney. Utah R.App. P. 24(j). In fact, this court has declined to address issues on appeal due to inadequate briefing. *See, e.g., State v. Gomez,* 2002 UT 120, ¶ 29, 63 P.3d 72 (declining to address inadequately briefed issues where there was no analysis except conclusory statements that the appellant was entitled to relief). Our hectoring of parties on this issue should not be misinterpreted as an invitation for longer briefs. It is rather a plea for concise, but thorough, briefing and a warning of the consequences where briefing falls short of the mark.

¶ 12 Additionally, in this case, Mr. Green challenges several of the factual underpinnings of the trial court's rulings. These issues are subject to the marshaling requirements set forth in Utah Rule of Appellate Procedure 24(a)(9). Mr. Green's brief offers us, all too frequently, a disjointed array of facts selected because they aid his cause. Too often, his legal analysis is little more than a conclusory statement unsupported by analysis or authority. Mr. Green also fails to properly cite to the record as required by Utah Rule of Appellate Procedure 24(e), a failing which requires us to research and review the voluminous record ourselves in order to uncover the factual underpinnings of Mr. Green's assertions.

¶ 13 We have repeatedly warned of the risks assumed by an appellant who fails to marshal evidence because "[w]hen an appellant fails to meet the heavy burden of marshaling the evidence, appellate courts are bound to assume the record supports the trial court's factual findings." Justice Michael J. Wilkins et al., *Utah Appellate Practice,* 2000 Utah L.Rev. 111, 128 (2000) (citing *Wade v. Stangl,* 869 P.2d 9, 12 (Utah Ct.App. 1994)). Despite being justified in turning away, for want of marshaling, all of Mr. Green's fact-dependent issues, we have elected to review several of them on their merits.

## ANALYSIS

### I. STATUTE OF LIMITATIONS

¶ 14 Mr. Green insists that the trial court applied the wrong statute of limitations to the rape of a child charge and that, had the

trial court applied the correct one, it would have been compelled to conclude that the State filed its charges against Mr. Green well after the statute's expiration.

¶ 15 Whether the trial court applied the proper statute of limitations is a matter of law that we review for correctness. *State v. Lusk*, 2001 UT 102, ¶ 11, 37 P.3d 1103. We review the trial court's findings concerning events relevant to the application of the statute of limitations as questions of fact, which we will not disturb unless clearly erroneous. *State v. Daniels*, 2002 UT 2, ¶ 18, 40 P.3d 611.

### A. Developments in Utah's Statute of Limitations for Rape of a Child

¶ 16 To provide context for Mr. Green's challenge to the trial court's selection of the statute of limitations, we outline the developments of Utah's statute of limitations for the crime of rape of a child between 1986, the year in which Melvin Green was conceived and born, and the present. In 1986, Utah law required that the prosecution of a felony be "commenced within four years after it [was] committed" unless a different time period was "otherwise provided" in the Utah Code. Utah Code Ann. § 76–1–302(1) (1978). Since 1983, Utah law has "otherwise provided" for rape of a child. *Id.* § 76–1–303(c) (1983). Section 303(c) authorizes prosecution for rape of a child beyond the four-year general felony period where the prosecution is initiated "within one year after the report of the offense to law enforcement officials so long as no more than eight years [had] elapsed since the alleged commission of the offense." *Id.* For convenience we will refer to the statutory provisions relating to the statute of limitations for rape of a child, which were in effect in 1986, as the "1983 limitations."

¶ 17 Taking January 1986, the month Melvin Green was conceived, as the date of the commission of the offense, the four-year general felony limitation period would have expired in January 1990, and the eight-year maximum span under the 1983 limitations would have elapsed in January 1994. Since the State did not commence its prosecution of Mr. Green until April 2000, the prosecution would have been long since time-barred had these statutory provisions alone controlled. However, they did not.

¶ 18 In 1991, the legislature "replac[ed] the eight-year statute of limitations with a limitations period permitting prosecution of sexual abuse of a child anytime *'within four years after the report of the offense to a law enforcement agency.'"* *Lusk*, 2001 UT 102 at ¶ 16, 37 P.3d 1103 (emphasis added) (quoting Utah Code Ann. § 76–1–303(3) (1991)). This amendment removed the date of the offense as the landmark for calculating the rape of a child limitations period and replaced it with a date-of-report reference point. In this case, the amendment has the effect of rendering Melvin Green's conception date irrelevant to the statute of limitations analysis.

### B. Mr. Green's Arguments Regarding the Statute of Limitations for Rape of a Child

¶ 19 Mr. Green attacks the applicability of the 1991 amendment on both legal and factual grounds. He asserts that the law governing the retroactive application of statutes forecloses the State's use of the amendment against him. He also argues that the factual record demonstrates that law enforcement officials had received a report that Mr. Green raped Linda more than one year before the effective date of the 1991 amendment, and therefore, even if the 1991 amendment applies retroactively, it does not apply to him because his exposure to prosecution under the 1983 limitations had ended.

¶ 20 We turn first to Mr. Green's legal challenge. We have determined that "a statutory amendment enlarging a statute of limitations will extend the limitations period applicable to a crime already committed only if the amendment becomes effective before the previously applicable statute of limitations has run." *Lusk*, 2001 UT 102 at ¶ 26, 37 P.3d 1103. This statement of law is controlling and dispatches Mr. Green's legal argument because the amendment was enacted in 1991, three years before the initial statute of limitations would have expired. Mr. Green does not attempt to distinguish or explain *Lusk*. Instead, he gestures toward,

but does not analyze, statutory and case authority to assert that the 1991 amendment does not have retroactive application.

¶ 21 He holds up section 68–3–3 of the Utah Code as a shield to retroactivity. This section provides that "[n]o part of these revised statutes is retroactive, unless expressly so declared." Utah Code Ann. § 68–3–3 (1986). Mr. Green then directs us to *State v. Lavoto,* 776 P.2d 912, 913 (Utah 1989), for confirmation that the 1991 amendment did not expressly make its provisions applicable to the crime of rape of a child. The sum total of Mr. Green's analysis of *Lavoto* is his notation that the case held that section 68–3–3 "means what it says." We agree, but the clarity of expression found in section 68–3–3 does not implicate the retroactivity of the 1991 amendment, nor does a 1989 case, *Lavoto,* provide any clarification or interpretative precedent for a law enacted in 1991.

¶ 22 *Lavoto* presented us with the question of whether the 1983 limitations applied to crimes involving sexual misconduct, which shared similar elements with offenses subject to the 1983 limitations, but were not identical to the newly created crimes enumerated in the 1983 limitations statutes. *Id.* at 913. We held that the 1983 limitations attached only to the crimes specifically identified within the 1983 limitations statutes. *Id.* We reached our result by applying the tools of statutory interpretation to the 1983 limitations provisions, a task in which section 68–3–3 played a negligible role. *Id.* Before 1983, our criminal code did not classify sex crimes by the age of the victim; therefore, conduct that incorporated the elements of rape of a child was prosecuted under the same statute as a rape of an adult. *Id.* We concluded that the legislature did not intend the 1983 limitations statutes to operate as a de facto retroactive creation of a separate category of crimes against children. *Id.* at 914. In enacting the 1991 amendment, the legislature conformed to the grant of authority we sanctioned in *Lavoto* by expanding the statute of limitations for a crime specifically listed in the prior statute, rape of a child. The revised statute of limitations for this offense, therefore, has retroactive application.

## C. No Report That Mr. Green Raped Linda Was Made to a Law Enforcement Agency on a Date That Would Cause the Statute of Limitations to Run, Barring His Prosecution

¶ 23 We next take up Mr. Green's contention that even if the 1991 amendment applied retroactively, it does not apply to him because the 1983 limitations had run before the 1991 amendment took effect. If the 1983 limitations had extinguished the rape of a child charge before the effective date of the 1991 amendment, the amendment could not revive it. To permit it to do so would be to countenance the retroactive application of substantive law in contravention of the "long-standing rule of statutory construction that a legislative enactment which alters the substantive law or affects vested rights will not be read to operate retrospectively unless the legislature has clearly expressed that intention." *Roark v. Crabtree,* 893 P.2d 1058, 1061 (Utah 1995) (citations omitted).

¶ 24 Mr. Green claims that the trial court erred when it determined that no report of his criminal conduct was made to law enforcement more than one year before the effective date of the 1991 amendment. He contends that several communications qualified as "reports to a law enforcement agency," and thus activated the one-year time limit under the 1983 limitation, barring his prosecution before the effective date of the 1991 amendment. Specifically, he cites to the following events: a call allegedly made in 1986 by Mr. Jay Slaugh to the Uintah County Sheriff's office reporting Mr. Green's marriage to Linda; information about an illegal polygamist marriage, or underage marriage or "child rape," communicated to Uintah County Sheriff's Deputy Wayne Hollebeke in 1986; the acquisition of Melvin Green's birth certificate by the Bureau of Vital Statistics; two communications between Detective Benson and Mr. Green, one of which allegedly contained a 1989 plea offer; two visits with the Green family by the Division of Child and Family Services (DCFS) in 1990 and 1995, and 1989 communications between LeeAnn Beagley and DCFS relating to the age of Linda at the time she gave birth to Melvin

Green; the State of Utah's acquisition of information, including birth certificates for every member of the Green family; and the knowledge of Cal Kunz, Linda's brother, that his sister had been fourteen when she gave birth to Melvin, which Cal did not report when he became a police officer in 1995. We agree with the trial court that none of these alleged communications activated the statute of limitations clock.

¶ 25 We will defer to the trial court's findings concerning the existence and content of the alleged communications unless we find them to be clearly erroneous. We explained this standard of review in *State v. Pena*, 869 P.2d 932 (Utah 1994), where we stated that

> [t]rial courts are given primary responsibility for making determinations of fact. Findings of fact are reviewed by an appellate court under the clearly erroneous standard. For a reviewing court to find clear error, it must decide that the factual findings made by the trial court are not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination. This standard is highly deferential to the trial court because it is before that court that the witnesses and parties appear and the evidence is adduced. The judge of that court is therefore considered to be in the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole, something an appellate court cannot hope to garner from a cold record.

*Id.* at 935–36 (citations omitted).

¶ 26 The trial court's task was not, however, limited to ascertaining the truth about the alleged communications. It was also required to compare its findings concerning the communications to the statutory mandate that a prosecution commence "within four years after the report of the offense to a law enforcement agency," Utah Code Ann. § 76-1-303(3) (1991), and to formulate its ruling on the ultimate question of whether the statute of limitations barred the prosecution of Mr. Green. This undertaking first obliged the trial court to interpret the phrases "report of the offense" and "law enforcement agency," a

legal exercise, which we review for correctness.

¶ 27 When it evaluated its factual findings in light of its statutory interpretations, the trial court produced a result which, for purposes of appellate review, bears the label "mixed question of law and fact." When reviewing a mixed legal and factual issue, we have, with certain exceptions, ceded the trial court "a certain measure of discretion." *Daniels*, 2002 UT 2 at ¶ 19, 40 P.3d 611. How generous the grant of discretion should be is not susceptible to the application of a fixed formula. It falls to us to gauge what amount of discretion is the equivalent of a "certain measure" in a particular case based on the degree to which the trial court's ruling was dependent on factual findings coupled with the nature of the legal issue presented. *Id.*

¶ 28 Before turning to our analysis of the merits of Mr. Green's factual challenges to the trial court's statute of limitations ruling, we are compelled to voice our oft-expressed frustration when we are faced, as we are here, with briefing which fails to acknowledge, much less tackle, an appellant's obligation to cull from the record " 'all relevant evidence . . . which tends to support the findings and demonstrate why the findings are clearly erroneous.' " *Timm v. Dewsnup*, 2003 UT 47, ¶ 24, 86 P.3d 699 (quoting *W. Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah Ct.App.1991)). This requirement contemplates that an appellant present "every scrap of competent evidence introduced at trial which supports the very findings the appellant resists" and then "ferret out a fatal flaw in the evidence," becoming a "devil's advocate." Justice Michael J. Wilkins et al., *Utah Appellate Practice*, 2000 Utah L.Rev. 111, 127 (2000) (citing *Majestic Inv. Co.*, 818 P.2d at 1315). To say that Mr. Green's brief wholly ignores this mandate is to extend the brief more praise than it deserves. We decline to conduct a comprehensive review of the record to cure Mr. Green's failings.

¶ 29 We return, then, to the communications that Mr. Green claims constituted a "report of the offense to a law enforcement agency," reviewing each under the standard

of review outlined above and, in the absence of marshaled evidence, in reliance on those portions of the record brought to our attention by the State.

### 1. The Communication Attributed to Mr. Slaugh

¶ 30 The trial court rejected as unbelievable Mr. Slaugh's testimony at an evidentiary hearing that he had previously reported Mr. Green's relationship with Linda. It grounded its refusal to credit Mr. Slaugh's testimony on the presence of bias and the absence of foundational specificity concerning the call. The record amply supports this finding. Mr. Slaugh is Mr. Green's brother-in-law, and both practice polygamy. Mr. Green told Mr. Slaugh it would be "a good idea" if someone testified at the hearing that he had reported Mr. Green's marriage to Linda. Additionally, in his testimony, Mr. Slaugh could not specify the date or time of his report, nor which sheriff's office he contacted. Nothing in the testimony of a number of Uintah County sheriff's deputies corroborates Mr. Slaugh's accounts of the contacts, nor do any surviving reports or documents within the sheriff's office. Law enforcement officials testified that procedures were in place to respond to a report of the rape of a child had it been reported, and all officers testified that no evidence exists that any of those procedures were implemented. We therefore affirm the trial court's finding that Mr. Slaugh made no communication concerning Mr. Green's conduct to the Uintah County Sheriff's office.

### 2. The Communication Allegedly Made to Deputy Hollebeke

¶ 31 Uintah County Sheriff's Deputy Wayne Hollebeke testified that he recalled a 1986 conversation with a female who alerted him that someone in "Horseshoe Bend" was selling or trading young women. About the same time, he was told that a local resident, Dale Stevens, had arranged for the marriage of his thirteen-year-old daughter to one of Mr. Slaugh's friends. Mr. Green insists that the second communication must have concerned Mr. Green's marriage to Linda because Mr. Stevens did not have a thirteen-year-old unmarried daughter at that time.

¶ 32 Despite Mr. Green's failure to marshal evidence in support of the trial court's finding that these communications did not constitute a report to a law enforcement agency, the fact that Deputy Hollebeke expressly denied that Linda's name arose in either of these communications is enough to overcome whatever persuasive power might be derived from Mr. Green's porous deductive logic and to sustain the trial court's finding that no report of Mr. Green's rape of Linda was reported to the Uintah County Sheriff's office.

### 3. The Filing of Melvin Green's Birth Certificate with the Bureau of Vital Statistics

¶ 33 According to Mr. Green, the statute of limitations began to run when Melvin Green's birth certificate was filed with the Bureau of Vital Statistics. Because the certificate contained the birth dates of both Melvin and Linda, Mr. Green contends the State was sufficiently alerted to the fact that Linda conceived Melvin when she was thirteen years of age. We will discuss below the features that a governmental entity must display to qualify as a "law enforcement agency." *See infra* 5(a). Even if we were to conclude that the communication of the raw statistical data disclosed in a birth certificate is a "report of an offense" (which we will also discuss *infra* 5(b)), and we do not so conclude, we do not feel compelled to embark on a searching inquiry or analysis before determining that the Bureau of Vital Statistics is not a law enforcement agency.

### 4. Communications with Deputy Sheriff Benson

¶ 34 Mr. Green alleges that he twice spoke with Salt Lake County Deputy Sheriff Richard Benson. According to Mr. Green, in the first conversation he provided Deputy Benson with the age of his wife Linda and the ages of their children. Mr. Green alleges that a few weeks later, Deputy Benson offered him a plea bargain.

¶ 35 Deputy Benson testified that he did not remember ever being provided information about Linda and that he did not offer

Mr. Green a plea. The trial court found that "Mr. Green's veracity was questionable," and that without substantial corroboration, the court did not accept his version of the events. Mr. Green has marshaled no evidence in support of these findings, and we decline to disturb them.

### 5. Communications with the Utah Division of Child and Family Services

¶ 36 Next, Mr. Green points to three incidents during which information concerning his relationship with Linda was communicated to DCFS: 1989 conversations between LeeAnn Beagley and a DCFS investigator, a June 1990 visit from a Sandy City detective and a DCFS employee, and a visit from DCFS employees occurring in either 1995 or 1996.

¶ 37 Mr. Green alleges that in 1989, LeeAnn Beagley[2] reported during multiple conversations with DCFS officials and a private therapist that Mr. Green had raped Linda. He argues that the revelations constituted reports to a law enforcement agency. The trial court reviewed DCFS transcripts and taped conversations and found no evidence that the offense was reported. The court also conducted an in camera review of the therapist's records and found no reference to Mr. Green and Linda. Not only did the court find beyond a reasonable doubt that LeeAnn did not make a report, the court stated that "even if she had, it would not have constituted a report to law enforcement within the confines of the applicable statute of limitations." Mr. Green failed to adequately challenge the trial court's factual findings that LeeAnn did not discuss Linda's rape during any of these encounters, and we will not disturb them.

¶ 38 LeeAnn's complaints about her own molestation by Mr. Green prompted a visit to Mr. Green's home by Deputy Benson and DCFS investigator Joseph Noble in 1989. During the visit, Deputy Benson and Mr. Noble interviewed several women, including Linda, and acquired the ages of Linda and Melvin. The trial court found credible the testimony of Deputy Benson and Mr. Noble that the women lied about their ages, that the focus of Benson and Noble's investigation was Mr. Green's alleged molestation of LeeAnn, and that they did not inquire into possible misconduct concerning Linda. Mr. Green does not challenge these findings.

¶ 39 Sandy City police officer Ronald Bullock and DCFS investigator Dennis Gale repeated the 1989 visit to the Green home to follow up on the prior investigation concerning LeeAnn's treatment by Mr. Green. Officer Bullock's and Mr. Gale's accounts of their interview with the occupants of the Green house paralleled the testimony concerning the 1989 visit of Deputy Benson and Mr. Noble. Each testified that he acquired no information about Linda. The trial court chose to believe the testimony of Officer Bullock and Mr. Gale. The trial court also made the obvious, but telling, observation that it was unlikely that the residents of the Green home would frame their responses to the inquiries of law enforcement officers and DCFS investigators in the form of reports of criminal offenses.

### (a) Defining "Report of the Offense" Under Utah Code section 76–1–303(c)

¶ 40 Mr. Green has consistently contended that the disclosure of ages and birth dates should suffice as a report and that the objectives of the statute of limitations are best served by a liberal interpretation of "report of the offense," imposing a duty on law enforcement to "connect the dots" or lose the opportunity to prosecute a child rapist. The trial court also determined that the information acquired during the visits to the Green home did not amount to a "report of the offense." This is a legal conclusion, which we review for correctness. *Daniels,* 2002 UT 2 at ¶ 18, 40 P.3d 611.

¶ 41 Under Mr. Green's preferred interpretation of the statutory language "report of the offense," the statute of limitations begins to run when "the facts once made known to a reasonable investigator, even if the exact

---

**2.** LeeAnn's sister Shirley Beagley became Green's third wife in 1985. LeeAnn's mother, June Johnson, became his fourth wife in 1986, and LeeAnn became his fifth wife in 1990 when she was fourteen years old.

claim is unknown then a duty of the due diligence is imposed upon the State to investigate and produce the claim" [sic]. This characterization, which minimizes the quantity and quality of the information necessary to create a report of the offense, and assigns to a law enforcement agency the responsibility to assemble and process data into a prosecution, is incompatible with the plain language of the 1991 statute of limitations.

¶ 42 When we assert our responsibility to interpret a statute, we begin by determining whether its meaning may be derived from the ordinary and generally accepted meaning of the statutory language. *State v. Hodges,* 2002 UT 117, ¶ 6, 63 P.3d 66. The meaning of the phrase "report of the offense" can be extracted by applying this method of interpretation. It is a phrase that contains two related elements: a description of a type of communication—a report—and the content of that communication—the offense. Under its most prominent definition, a report is "[a] formal oral or written presentation of facts." *Black's Law Dictionary* 1303 (7th ed.1999). This connotation of formality distinguishes a report from, for example, an overheard remark. The word "report" is also strongly suggestive of purposeful communication. Its use in the 1991 amendment underscores this component of the meaning of a report. In its statutory setting, the report is a communication made for the purpose of alerting law enforcement to the existence of criminal conduct.

¶ 43 The language of the 1991 amendment also requires that the "offense" be reported. While it would be unreasonable to adopt an overly narrow interpretation of an "offense," for instance, one that could be satisfied only through reference to Utah Code sections, the disclosure of mere clues that criminal conduct has occurred is not enough. Just as the requirement of a report implies some degree of formality in its communication, so the requirement that an offense be disclosed implies a degree of articu-

lation of criminal conduct sufficient to permit a law enforcement agency to conclude what was done and who did it without additional investigation or analysis.

¶ 44 A definition of "report of an offense," which requires a heightened level of specificity, is highlighted when contrasted with Mr. Green's definition, which couples an undemanding content requirement with a heightened responsibility on law enforcement agencies to exercise "reasonable diligence" to piece together the commission of an offense from a communication laden with innocent artifacts of data. Had the legislature intended to impose on law enforcement agencies the obligation to discover that a crime may have been committed by gathering and analyzing the universe of information which they may receive or to which they may have access or be in peril of depriving the State of the opportunity of prosecuting a child rapist, it could have done so with specific language. In fact, as the trial court noted in its ruling, other states have elected to enact statutes which commence the running of the statute of limitations on the discovery of the offense.[3] We agree with the trial court that "discovery" and "report" are not synonymous. The terms identify different actors. The law enforcement agency is the entity which "discovers." It is not the source of the "report," but rather the recipient of it.

¶ 45 Mr. Green holds out his interpretation of "report of the offense" as being most compatible with the policy considerations, which are the foundation of statutes of limitation, among them protecting parties from stale claims and promoting diligence in the prosecution of criminal offenses. Although we rest our interpretation on the plain language of section 76–1–303(c), we note that the statutory evolution of limitations on actions for sexual offenses against a child manifests a consistent commitment to a public policy which assigns paramount importance to the heinous nature of child sexual offenses

---

3. *See, e.g.,* Iowa Code § 802.5 (2003) (extending Iowa's three-year limitations period by one year for prosecution of crimes of fraud where the prosecution is commenced within one year after discovery of the offense); Nev.Rev.Stat. § 171.095(1)(a) (2004) (allowing prosecution of sexual abuse of a child to commence within a specified time frame after the discovery of the offense); Ohio Rev.Code Ann. § 2901.13(B) (Anderson 2004) (allowing prosecution of a crime involving fraud within one year of the discovery of the offense).

and, owing in large part to the vulnerability of the victim, the difficulty in achieving prompt detection of the offense and prosecution of the perpetrator.

¶ 46 Accordingly, we decline to import a "discovery rule" into section 76–1–303(c). The trial court advanced a three-part test for evaluating whether something qualifies as a "report of the offense." This test, which we find to be conceptually sound and to hold the promise of functional utility, requires (1) a discrete and identifiable oral or written communications (2) that is intended to notify a law enforcement agency that a crime has been committed and (3) that actually communicates information bearing on the elements of a crime as would place the law enforcement agency on actual notice that a crime has been committed. None of the communications upon which Mr. Green relies meet this standard.

¶ 47 The trial court also determined that the alleged report to DCFS could not trigger the statute of limitations because DCFS is not a "law enforcement agency" as that term is used in section 76–1–303(c). The trial court's interpretation of what constitutes a "law enforcement agency" under section 76–1–303(c), like its interpretation of "report of the offense," is a question of law, which we review for correctness. *Daniels*, 2002 UT 2, 40 P.3d 611 at § 18.

(b) Defining "Law Enforcement Agency" Under Utah Code section 76–1–303(c)

██ ¶ 48 We again begin our interpretive inquiry by examining the "plain language" of the term "law enforcement agency." *Exxon-Mobil Corp. v. State Tax Comm'n*, 2003 UT 53, ¶ 14, 86 P.3d 706 (citing *In re Worthen*, 926 P.2d 853, 866 (Utah 1996)). Confronted in isolation and free of context, "law enforcement agency" might reasonably include several meanings and conjure images of different entities. In its broadest sense, a law enforcement agency may well bring to mind the whole of the executive branch of government, the branch charged under our constitution with the duty to "see that the laws are faithfully executed." Utah Const. art. VII, § 5. To a motorist viewing flashing lights in her rearview mirror, a law enforcement agency is likely to have a more focused meaning. It has been suggested that the general population perceives law enforcement as individuals who wear a "blue, brass-buttoned suit, ornamented with a silver star over [their] heart." *State v. Bradshaw*, 541 P.2d 800, 802 (Utah 1975) (Henriod, C.J., concurring). Our cases have consistently denoted "law enforcement" in accordance with this popular definition, but without Chief Justice Henriod's descriptive flair.[4] It is a term which we have uniformly freighted with commonly understood features, including the authority to exercise reasonable force to maintain order, to detect crime, and to enforce criminal statutes.

¶ 49 This definition of law enforcement claims substantial statutory support. Utah Code section 53–1–102(1)(c)[5] defines "law enforcement agency" as "an entity of the federal government, a state, or a political subdivision of a state ... that exists primarily to prevent and detect crime and enforce criminal laws, statutes, and ordinances." Utah Code Ann. § 53–1–102(1)(c) (Supp.2004). Similarly, a "law enforcement officer" is defined as an employee of a law enforcement agency "whose primary and principal duties consist of the prevention and detection of crime and the enforcement of criminal statutes or ordinances of this state or any of its political subdivisions." *Id.* § 53–13–103 (2002). Elsewhere within the code a "peace officer" is defined as "any employee of a police or law enforcement agency ... whose duties consist primarily of the prevention and detection of criminal statutes or ordinances

---

4. *See, e.g., State v. Brake*, 2004 UT 95, ¶ 30, 103 P.3d 699 (interchanging "police officer" and "law enforcement officer"); *State v. Hansen*, 2002 UT 125, ¶¶ 33–34, 63 P.3d 650 (discussing three types of traffic stops initiated by police or "law enforcement officials"); *State v. Farrow*, 919 P.2d 50, 53–54 (Utah Ct.App.1996) (noting that the Domestic Abuse Procedures Act "provides law enforcement with warrantless arrest powers in domestic protection cases" and that "law enforcement personnel shall ... protect[] the victim, and enforce[] ... criminal laws.").

5. Utah Code sections 53–1–101 to –304 is the Public Safety Code governing the administration of police agencies.

of this state or any of its political subdivisions." *Id.* § 76–8–101(3)[6] (Supp.2003).

¶ 50 We find no merit in Mr. Green's contention that DCFS is a law enforcement agency because it shares investigatory functions with law enforcement. These shared functions are ancillary to its primary purpose of providing child welfare services. *Id.* § 62A–4a–103(2)(a) (Supp.2004). DCFS has been the target of considerable public and legislative controversy over the extent of police powers which the agency should be authorized to wield in furtherance of its child welfare mission. For example, section 62A–4a–202.1(2)(a) of the Utah Code authorizes a child welfare worker to "take and maintain protective custody of a minor, without a warrant, in accordance with the requirements of this section." *Id.* (Supp.2004) However, certain provisions have also been put in place to limit the power of DCFS to remove children from their homes, including section 62A–4a–203, which instructs that "because removal of a child from his home may affect protected, constitutional rights of the parent, the division shall (a) . . . make reasonable efforts to prevent or eliminate the need for removal of a child" and to "(b) determine whether there is substantial cause to believe that a child has been or is in danger of abuse or neglect . . . prior to removing the child from his home." *Id.* § 62A–4a–203(1)(a)–(b) (2000). Notwithstanding public concern over this reach of its power, DCFS, as its name implies, is not a law enforcement, but a service oriented, agency.

¶ 51 Mr. Green seeks to attach the law enforcement agency label to DCFS because the legislature has designated officers of the division, together with peace officers and law enforcement agencies, as the parties responsible for receiving statutorily mandated notification of crimes committed against children. *Id.* § 62A–4a–403(1). This status does not render DCFS a law enforcement agency. That it does not is implied by the language of the statute, which classifies DCFS separately from law enforcement agencies. Moreover, the reporting statute includes an additional

directive to DCFS mandating that "[i]f an initial report of child abuse or neglect is made to the division, the division shall immediately notify the appropriate local law enforcement agency." *Id.*

¶ 52 The reporting statute contemplates a collaborative role between DCFS and law enforcement agencies, which recognizes the distinct primary missions of each: the child welfare goals of DCFS, and the crime detection and criminal law enforcement goals of law enforcement agencies. Accordingly, based on plain meaning, case law, and analogous contextual use, we agree with the trial court that "law enforcement agency" is "one whose primary duty is to prevent and detect crime, and which has general police power and is charged with making arrests in connection with the criminal statutes and ordinances of the State of Utah or any political subdivision thereof." Because DCFS is not a law enforcement agency, reports made to it do not implicate the provisions of the 1983 limitations and, therefore, any communications made to DCFS concerning Mr. Green's relationship with Linda more than one year before the effective date of the 1991 amendment did not trigger the running of the limitations period, extinguishing the State's ability to prosecute Mr. Green.

6. Application for Public Assistance, Including Birth Certificates of All Green Children, Provided to the State of Utah

¶ 53 Similarly, Mr. Green argues that his application to the State of Utah for public assistance benefits constituted a report of the crime based on his submission of birth certificates and social security cards for members of the Green family. This information is the extent of Mr. Green's proffered argument regarding what he believes to have been a "report" to the State of Utah. Like DCFS, state agencies governing public assistance benefits are not "law enforcement agencies," and birth certificates alone do not constitute a "report" of a crime. *See supra* 5(a)-(b).

---

**6.** This section of the Utah Criminal Code governs offenses against the administration of government.

**7. Cal Kunz's Knowledge That Linda Conceived Melvin When She Was Fourteen**

¶ 54 Mr. Green's final argument, alleged to prove that a report of the rape of Linda was made to law enforcement, stretches the bounds of credulity. Mr. Green argues that since Linda's half-brother, Cal Kunz, knew Linda's age when she married Mr. Green, this knowledge was transmuted into a report when Kunz became a Salt Lake City police officer in 1995. We reject this argument for two reasons. First, Kunz testified that he did not know Linda's age when she became pregnant. Second, we join the trial court in finding "absurd" the premise that if Kunz had knowledge of the crime, acquired when he was thirteen or fourteen years of age, it constituted a statutory report. We therefore affirm the trial court's ruling that no statute of limitations bars the prosecution of Mr. Green.

## II. JURISDICTION AND VENUE

### A. Jurisdictional Issues on Appeal

■ ¶ 55 Mr. Green appeals the trial court's conclusion that it had jurisdiction over his prosecution for rape of a child. The trial court found that the State had not proven that Mr. Green had engaged in sexual intercourse with Linda in the state of Utah. It nevertheless concluded that jurisdiction was proper because under Utah law Mr. Green's conduct in Utah constituted a solicitation of or a conspiracy to commit a rape of a child in Mexico, where Mr. Green's sexual intercourse with the thirteen-year-old Linda was also unlawful.[7]

¶ 56 The trial court grounded its jurisdiction in the substance and purpose of Mr. Green's conduct and communications with Linda's father, John Kunz,[8] and with Linda's mother, Mr. Green's ex-wife, Beth Green. In them, the trial court found evidence to support Mr. Green's solicitation of, and conspiracy with, these individuals to commit the rape of Linda. It found that Mr. Green had solicited the consent of Mr. Kunz to marry Linda during a conversation in Lehi, Utah. Mr. Kunz left no room for confusion over his rejection of Mr. Green's request for his consent. The trial court construed Mr. Green's request, and the reaction to it, to be a request for marriage, which would include sexual relations. Applying Utah Code section 76–2–202 [9] to its findings, the trial court determined that had Mr. Kunz consented to the marriage of his daughter to Mr. Green, he would have been criminally liable as a party to Mr. Green's rape of Linda and, therefore, Mr. Green's request for consent constituted criminal solicitation in Utah.

¶ 57 The trial court found that Beth Green consented to the "betrothal" of Linda to Mr. Green while in Utah and that the weight of the evidence supported a definition of betrothal that contemplated a sexually consummated marriage. It determined, therefore, that Mr. Green had both solicited and conspired with Beth Green to commit the rape

---

**7.** In Utah, the elements necessary to exercise jurisdiction over a defendant can be found, in pertinent part, in Utah Code section 76–1–201:

(1) A person is subject to prosecution in this state for an offense which he commits, while either within or outside the state, by his own conduct or that of another for which he is legally accountable, if:

(a) the offense is committed either wholly or partly within the state;

(b) the conduct outside the state constitutes an attempt to commit an offense within the state;

(c) the conduct outside the state constitutes a conspiracy to commit an offense within the state and an act in furtherance of the conspiracy occurs in the state; or

(d) the conduct within the state constitutes an attempt, solicitation, or conspiracy to commit in another jurisdiction an offense under the laws of both this state and the other jurisdiction.

. . . .

(8) The judge shall determine jurisdiction.

Utah Code Ann. § 76–1–201(1), (8) (Supp.2004).

**8.** Linda's father, John Kunz, refused to grant his consent, telling Mr. Green that if he married Linda he would "have the law after him."

**9.** Section 76–2–202 instructs that "[e]very person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." Utah Code Ann. § 76–2–202 (2003).

of Linda. *See* Utah Code Ann. § 76–4–201 (providing the elements of a conspiracy).[10]

¶ 58 Mr. Green's brief challenges these findings in a discursive and argumentative presentation of his version of the facts. As with his challenges to the trial court's factual findings relating to the statute of limitations, he once again fails to give so much as a nod to his duty to marshal the evidence in support of the trial court's findings. According to Mr. Green, the central flaw in the trial court's assessment of the evidence is its misapprehension of the concept of "betrothal." Under Mr. Green's definition, betrothal constitutes a commitment to marry in the future and nothing more. It falls short of the contemplation, plan, or intent to marry and have sexual intercourse necessary to establish the elements of a conspiracy. The trial court found incredible Mr. Green's testimony that the decision to marry Linda was made spontaneously while vacationing in Mexico. It chose instead to take seriously the comments that Mr. Green and members of his family made in numerous media appearances that demonstrated the falsity of Mr. Green's definition of his betrothal to Linda.

¶ 59 Mr. Green has presented us with no evidence that the trial court erred when it found that a betrothal manifested a plan or intention to engage in sexual relations. Accordingly, we affirm the trial court's ruling that the prosecution of Mr. Green was subject to the court's jurisdiction.

### B. Proper Venue

¶ 60 Utah law instructs that

criminal actions shall be tried in the county, district, or precinct where the offense is alleged to have been committed. In determining the proper place of trial, the following provisions shall apply:

(g) When an offense is committed within this state and it cannot be readily determined in which county or district the offense occurred, the following provisions shall be applicable:

. . . .

(v) . . . trial may be held in the county in which the defendant resides.

Utah Code Ann. § 76–1–202(1)(g)(v) (Supp. 2004).

■ ¶ 61 The trial court found that the State did not meet its burden in proving that Linda was raped in Utah, but did find that the State proved that criminal solicitation and criminal conspiracy took place in Utah and, therefore, the State had jurisdiction over defendant. Section 76–1–202(1)(g)(v) allows prosecution, in the county where the defendant resides. *Id.* When Mr. Green was arrested for rape of a child, he lived in Juab County, and thus, Juab County was the proper venue.

### CONCLUSION

¶ 62 We affirm the trial court's determination that the 1991 amended statute of limitations for rape of a child applies to Mr. Green because no reports of the offense were made to law enforcement prior to 1999. We also affirm the trial court's finding that it had proper jurisdiction over Mr. Green and agree that Juab County was the proper venue because it was Mr. Green's residence at the time of his arrest.

¶ 63 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.

---

10. Section 76–4–201 states that

[f]or purposes of this part a person is guilty of conspiracy when he, intending that conduct constituting a crime be performed, agrees with one or more persons to engage in or cause the performance of the conduct and any one of them commits an overt act in pursuance of the conspiracy, except where the offense is a capital felony, a felony against the person, arson, burglary, or robbery, the overt act is not required for the commission of conspiracy.

*Id.*